Paul **KALMANOVITZ, individually and as a shareholder of Pabst Brewing Company, and S & P Company, a California corporation, Plaintiffs,**

v.

**G. HEILEMAN BREWING COMPANY, INC., a Wisconsin corporation, Russell G. Cleary, HBC Acquisition, Inc., a Delaware corporation, Pabst Brewing Company, a Delaware corporation, William F. Smith, Jr., Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay, Defendants.**

**Paul KALMANOVITZ, an individual, and S & P Company, a California corporation, Plaintiffs,**

v.

**Irwin JACOBS, an individual, Dennis Mathisen, an individual, Gerald A. Schwalbach, an individual, and Daniel T. Lindsay, an individual, Defendants.**

**Civ. A. No. 82–797.**
**(Formerly California A. Nos. C83 0196, C83 0704).**

United States District Court,
D. Delaware.

Sept. 28, 1984.

**1388**

Robert K. Payson and Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., and Joseph L. Alioto, Joseph M. Alioto, John I. Alioto, and Gary D. Elion of Alioto & Alioto, San Francisco, Cal., for plaintiffs.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, Del., and Harry Davidow of Weil, Gotshal & Manges, New York City, for defendants Irwin L. Jacobs, Dennis M. Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay.

Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Maurice J. McSweeney of Foley & Lardner, Milwaukee, Wis., and Leslie C. Smith of Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C., for defendants G. Heileman Brewing Co., Inc., Russell G. Cleary, and HBC Acquisition, Inc.

A. Gilchrist Sparks, III, Eric Howard and Michael Houghton of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Willis B. Snell of Sutherland, Asbill & Brennan, Washington, D.C., for defendants Pabst Brewing Co. and William F. Smith, Jr.

## OPINION

LATCHUM, Senior District Judge.

### I. BACKGROUND

Plaintiffs, Paul Kalmanovitz [1] ("Kalmanovitz"), individually and as a shareholder of Pabst Brewing Company ("Pabst"), and S & P, a California corporation ("S & P") (collectively "plaintiffs"), brought this action on December 10, 1982, pursuant to (a) Sections 10(b), 13(e), 14(d), and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(e), 78n(d), and 78n(e), and the rules and regulations promulgated by the SEC thereunder; (b) Section 1 of the Sherman Act, Section 7 of the Clayton Act, 15 U.S.C. §§ 1, 18; and (c) the laws of the State of Delaware. (Docket Item ["D.I."] 1 at 3.)

Originally, three separate lawsuits were filed, however, the cases have subsequently been consolidated into this present case. This lawsuit began in 1982, the result of the fierce battle for control of Pabst between Kalmanovitz, the Jacobs Group which included Irwin L. Jacobs ("Jacobs"), Dennis Mathisen ("Mathisen"), Gerald A. Schwalbach ("Schwalbach") and Daniel I. Lindsay ("Lindsay"), and G. Heileman Brewing Company, Inc. ("Heileman"). Presently pending before this Court are two motions: (a) defendants' motion to dismiss Counts I through X of the Complaint [2] (D.I. 166); and (b) plaintiffs' motion to certify the antitrust and tortious interference claims for appeal pursuant to Fed.R.Civ.P. 54(b). (D.I. 160.)

---

1. Kalmanovitz is a citizen of California and the beneficial owner of twenty shares of common stock of Pabst. (D.I. 1 at 1.)

2. This Court in *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 576 F.Supp. 922 (D.Del.1983), dismissed Counts XI and XII of Kalmanovitz's original, twelve-count complaint in C.A. No. 82–797.

## II. FACTS

Because this Court has already recounted the details of the battle for control of Pabst,[3] this discussion therefore will be limited to a thumbnail sketch of the operative facts.

On October 26, 1982, Kalmanovitz and Jacobs, along with three of Jacobs' associates (the "Jacobs Group"), entered into a Memorandum of Terms (the "October 26 contract"), by which Kalmanovitz and the Jacobs Group, through JMSL Acquiring Corporation ("JMSL"),[4] agreed to make a tender offer for 3,000,000 Pabst shares at $24 per share.[5] (D.I. 121, Ex. 1 at 2.) Acquisition of these 3,000,000 shares, combined with 1,440,305 Pabst shares the Jacobs Group already owned, would have given the parties to the agreement a majority of outstanding Pabst stock.

On October 27, 1982, Kalmanovitz and the Jacobs Group made the tender offer for 3,000,000 shares of Pabst stock at $24 per share (the "Jacobs-Kalmanovitz offer"). (*Id.* at Ex. 2.) The Jacobs-Kalmanovitz offer was opposed by the management of Pabst, e.g., William F. Smith, Jr., Pabst's president. As a result of a series of meetings between Smith and the chief executive officer of Heileman, Russell G. Cleary, on November 10, 1982, Heileman commenced a competing tender offer through a wholly-owned subsidiary called "HBC Acquisition, Inc." ("HBC"), a wholly-owned subsidiary of Heileman (the "Heileman offer"). (*Id.* at Ex. 3.) The Heileman offer was for 5,500,000 shares of Pabst stock at $27.50 per share.

On November 18, 1982, the Jacobs-Kalmanovitz offer was amended and increased to $30 per share. This increase in the Jacobs-Kalmanovitz offer was made possible by an amendment to the October 26 contract whereby Kalmanovitz agreed to increase his cash participation in the offer from $26,394,720 to $44,394,720. (*Id.* at Ex. 4.) At the same time, on November 18, 1982, defendant Jacobs promised, on behalf of the Jacobs Group in a letter to Kalmanovitz, that in the event the Jacobs Group decided to sell its 1,140,305 shares of Pabst stock, rather than continuing to bid higher, it would pay Kalmanovitz 50% of all amounts it received in excess of $24 per share for all the shares in the Group (the "Letter Agreement"). (*Id.* at Ex. 6.)

On November 23, 1982, the Jacobs-Kalmanovitz offer was further amended and increased to $35 per share. This increase in offer was accompanied by the further understanding that Kalmanovitz would increase his cash participation in the offer to $59,394,720. (*Id.* at Exs. 7 & 8.)

On November 24, 1982, this Court denied motions for preliminary injunctions against the Jacobs-Kalmanovitz offer (brought by the Heileman group) and against the Heileman offer (brought by the Jacobs Group and Kalmanovitz). Heileman announced after the hearing that it would reduce the number of shares sought in its offer to 4.25 million and that it had approximately 3.9 million shares already in its depository.

That afternoon, on November 24, 1982, Jacobs telephoned Cleary and expressed concern about his (Jacobs) ability to go ahead financially. Cleary gathered from the conversation that Jacobs felt that he didn't want to go any further from a resources standpoint and he asked for sug-

---

3. The Court has six prior published opinions concerning this litigation: *Kalmanovitz v. G. Heileman Brewing Co.,* 576 F.Supp. 922 (D.Del. 1983); *United States v. G. Heileman Brewing Co.,* 563 F.Supp. 642 (D.Del.1983); *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del. 1982); *Jacobs v. G. Heileman Brewing Co.,* 551 F.Supp. 639 (D.Del.1982); *Pabst Brewing Co. v. Jacobs,* 549 F.Supp. 1068 (D.Del.), *aff'd,* 707 F.2d 1392 & 1394 (3d Cir.1982); *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050 (D.Del.1982).

4. The tender offer was to be made by JMSL Acquiring Corp. ("JMSL"), a Delaware corporation wholly owned by PST Acquiring Corp. ("PST"), another Delaware corporation which was to be owned 50% by the Jacobs Group and 50% by Kalmanovitz. (D.I. 121, Ex. 1 at 3.) As part of the October 26 contract, Kalmanovitz would become a 50% shareholder in PST for $1,000.

5. At the time the parties entered into the October 26 contract, the price for shares of stock in Pabst trading on the New York Stock Exchange was approximately $20 per share.

gestions to resolve the situation. During this conversation, Jacobs told Cleary that he would withdraw from the bidding for Pabst shares in exchange for $7,500,000.

As a result of the negotiations begun on November 24, 1982, the Jacobs and Heileman groups entered into a contract on November 26, 1982, in which HBC agreed to terminate its old offer and announce a new offer which increased the number of shares to 5,600,000, raised the price to $29, and increased the value of notes to be paid to stockholders in a second-step merger from $20 to $24 per share. (*Id.* at Exs. 9, 10.) The Jacobs Group agreed to tender its shares into the new offer. The parties also agreed to dismiss all outstanding non-derivative litigation and that, upon dismissal, the Jacobs Group would be reimbursed $7.5 million for expenses incurred in its battle for control, this cost to be shared equally by Heileman and Pabst.

Also on November 26, 1982, Jacobs called Kalmanovitz's attorney and stated that "he worked out a deal with Heileman to pay [Kalmanovitz] $5,000,000 if [he] would agree to withdraw from the bidding." This offer to pay Kalmanovitz was accompanied by an offer that he might share with Jacobs "in a bargain purchase of Pabst's Milwaukee office building." Kalmanovitz rejected the offer.

On December 2, 1982, HBC made a new tender offer for Pabst shares (seeking 5,600,000 shares at $29 per share) (the "HBC Offer"). (*Id.* at Ex. 11.) Kalmanovitz made a competing offer on December 6, 1982 for 4,150,000 shares at $32 per share. (*Id.* at Ex. 13.) On December 10, 1982, Kalmanovitz filed this action and moved for a preliminary injunction to stop the HBC Offer.

On December 20, 1982, this Court denied Kalmanovitz's motion. HBC increased its offering price to $32 per share on December 15, 1982. On December 22, 1982—the withdrawal date for the HBC Offer—Kalmanovitz increased his offering price to $40 per share. (*Id.* at Ex. 16.) On December 23, 1982, Heileman accepted for payment 5,600,000 shares of Pabst and the contest for control of Pabst ended.

## III. DEFENDANTS' MOTION TO DISMISS

■ Because affidavits have been filed by plaintiffs and defendants in this proceeding, the Court will consider defendants' motion to dismiss as one for summary judgment pursuant to Rule 56. Fed.R. Civ.P. 12(b). Under Rule 56, a court may enter summary judgment only "if the pleadings, depositions, answers and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Any reasonable inferences from the facts must be resolved in favor of the party against whom the judgment may be entered. *Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters and Joiners,* 676 F.2d 81, 84 (3d Cir.1982).

### 1. *Plaintiffs' Claims For Injunctive Relief*

Courts will not consider granting injunctions when "the circumstances are such that the injunction cannot be enforced by the court." 43 C.J.S. *Injunctions* § 34; *Penn Central Co. v. Buckley & Co.,* 293 F.Supp. 653 (D.N.J.1963), *aff'd,* 415 F.2d 762 (3d Cir.1969).

■ It is presently infeasible to ask this Court to enjoin acts which purportedly will violate the federal securities laws and antitrust laws or Delaware state law when these acts have already occurred. *See Kauffman v. Johnston,* 454 F.2d 267 (3d Cir.1972) (petition to enjoin deprivation of religious rights in connection with 1969 Passover mooted by passing of the holiday); *Tymiak v. Omodt,* 676 F.2d 306 (8th Cir.1982) (plaintiff's request for injunction to prevent his ejectment was rendered moot by his ejectment); *Mougios v. W.R. Grace & Co.,* 52 F.R.D. 576 (S.D.N.Y.1971) (request to enjoin stockholders meeting was rendered moot by the holding of the meeting); *see also Friends of the Earth Inc. v. Bergland,* 576 F.2d 1377 (9th Cir. 1978); *Marchand v. Director, U.S. Probation Office,* 421 F.2d 331 (1st Cir.1970).

■ A review of plaintiffs' request for relief illustrates the complete impracticality

of the request in light of the events of the past two years. Plaintiffs ask that Heileman be enjoined from voting its Pabst shares (D.I. 1 at 34, ¶ B); that the asset transfer be stopped (¶ C); and that the solicitation and purchase of Pabst shares (¶¶ D, E) and the implementation of the merger be stopped (¶ F). Plaintiffs also ask that the defendants be enjoined from violating federal and state law. (*Id.*, ¶¶ G, H, J, K, O.) The solicitation and purchase of shares, the vote, the merger and the asset transfers have, however, all occurred. This Court, therefore, cannot retroactively prohibit acts which are finished and which this Court refused to primarily enjoin on December 23, 1982.

### 2. *Standing To Maintain Action For Damages*

Plaintiffs allege in Counts I through IV of the Complaint that defendants, in connection with the HBC Offer, violated Sections 13(e), 14(d) and 14(e) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78m(e), 78n(d), and 78n(e). (D.I. 1 at 16–20.) The defendants argue that because the purpose of the Williams Act was to protect investors faced with an offer for the purchase of their shares and not to provide a money damages remedy to unsuccessful contestants for control of a corporation, plaintiffs lack standing to maintain any action for money damages based on alleged violations of Sections 14(d), 14(e) or 13(e), of the Exchange Act.

### a. *Count I—Fraud In Connection With a Tender Offer: Section 14(e) of the Exchange Act.*

 Section 14(e) of the Exchange Act is a general anti-fraud statute in connection with a tender offer which provides in part:

(e) It shall be unlawful for any person to make any untrue statement of a mate-

rial fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

Kalmanovitz argues that he has standing to bring this suit because he "brings suit individually and as a shareholder of Pabst, the target corporation." (D.I. 1, ¶ 16.) Kalmanovitz emphasizes that point in the hope of circumventing the holding of the United States Supreme Court in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). In that case, the Court held that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under section 14(e). That case arose out of a contest between Chris-Craft Industries, Inc. ("Chris-Craft") and Bangor Punta Corp. ("Bangor") for control of Piper Aircraft Corp. ("Piper"). In that contest, Bangor, with the support of Piper, was successful, through a tender offer and over-the-counter purchases, in acquiring a majority of Piper's outstanding stock. During the course of the struggle for control, Chris-Craft filed an action against Bangor, Piper, and The First Boston Corp. (Bangor's underwriter in its tender offer), claiming that Bangor's tender offer violated Section 14(e) of the Exchange Act.

After the Court denied the requests for injunctive relief, Bangor acquired a majority interest in Piper and Chris-Craft sought to press its claim for money damages. The Court, in applying the analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[6] held that Section 14(e) does *not*

---

**6.** Because the Exchange Act does not expressly provide a private remedy for alleged violations of Section 14 or 13, any private right of action arising from violations of those sections must be implied. In *Cort v. Ash*, the Supreme Court set forth four factors relevant in determining whether a private remedy is implicit in a federal

statute not explicitly providing one. Those four factors are (1) whether plaintiff is one of the class for whose special benefit the statute was enacted, (2) whether the legislature intended to create a private remedy, (3) whether a private right of action would be consistent with the underlying purposes of the legislative scheme,

create a private right of action for money damages by an unsuccessful competitor for control.

The Court in *Piper v. Chris-Craft* began its analysis by framing the issue before it as:

> [w]hether tender offerors such as Chris-Craft, whose activities are regulated by the Williams Act, have a cause of action for damages against other regulated parties under the statute on a claim that anti-fraud violations by other parties have frustrated the bidder's efforts to obtain control of the target corporation.

430 U.S. at 24, 97 S.Ct. at 940.

In holding that there was no such private remedy for money damages, the Court relied in part on the following findings:

> The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information. *We find no hint in the Legislative history, on which respondent so heavily relies, that Congress contemplated a private cause of action for damages by one of several contending offerors against a successful bidder or by a losing contender against a target company.*

430 U.S. at 35, 97 S.Ct. at 946. (emphasis added).

Kalmanovitz attempts to avoid the holding in *Piper* by claiming that he brought this suit individually in his capacity as a stockholder of Pabst and not as a competing tender offeror. The Court finds this argument to be without merit.

A cursory review of the facts will demonstrate why the Court cannot accept Kalmanovitz's argument. First, Kalmanovitz entered into an agreement with the Jacobs Group to purchase 3,000,000 shares of Pabst stock. As part of the October 26 contract, Kalmanovitz was to become a 50%

shareholder in PST, the parent company to JMSL, the maker of the tender offer.

On October 27, 1982, the Jacobs-Kalmanovitz tender offer was made for 3,000,000 shares at a total price of $72,000,000. Kalmanovitz, pursuant to the October 26 contract and the subsequent amendments, agreed to a cash participation in the offer up to $59,394,720. (D.I. 121 at Ex. 8.) When Jacobs wished to withdraw from the offer, Kalmanovitz not only refused to withdraw, he subsequently made a competing tender offer for 4,150,000 shares at $32 per share (Kalmanovitz later increased his offering price to $40 per share). Then during his competing tender offer, on December 10, 1982, Kalmanovitz filed this action seeking a preliminary injunction to stop the HBC Offer.

Finally, Kalmanovitz alleged ownership of only 20 shares of Pabst stock. Given this miniscule stake in any possible recovery, his assertion of standing on the basis of a shareholder is without merit. *See also Luptak v. Central Cartage Co.,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,034 (E.D.Mich.1979), *aff'd,* 647 F.2d 165 (6th Cir.1981), where the court noted that "plaintiff's individual stake in the outcome of the suit as a shareholder is minimal when compared with his interest as a potential offeror. Thus, although plaintiff seeks relief as a DIBC shareholder, it would be more realistic to characterize him as a competing tender offeror...." *Id.* at ¶ 91,352.[7]

In *Piper v. Chris-Craft,* the Court addressed this exact problem and it specifically rejected the notion that Chris-Craft could sue as a disappointed Piper stockholder. As the Court noted:

> As a tender offeror *actively* engaged in competing for Piper stock, Chris-Craft was not in the posture of a target share-

---

and (4) whether the cause of action is one traditionally relegated to state law. *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088.

**7.** *See also Pabst Brewing Company v. Kalmanovitz,* 551 F.Supp. 882 (D.Del.1982) where this Court found that the "[f]acts clearly indicate

that Kalmanovitz and Jacobs ... have personally invested substantial capital in order to capitalize the tender offer by the acquiring corporations. Thus, there is no question that Kalmanovitz and Jacobs are the dominating and motivating principals behind the JMSL tender offer." 551 F.Supp. at 892–93.

holder confronted with the decision of whether to tender or retain its stock. 430 U.S. at 35, 97 S.Ct. at 946 (emphasis added).

Because Kalmanovitz was actively engaged in competing for control of Pabst, Kalmanovitz has no standing to sue for damages based on a section 14(e) violation.

b. *Count II: Fraudulent, Misleading and Incomplete SEC Filings: Section 14[d] of the Exchange Act*

Kalmanovitz alleges in Count II of his complaint that all of the defendants "have filed and have caused Heileman to file, a Schedule 14D–1 and Offer to Purchase and have caused Pabst to file a Schedule 14D–9, which contain statements which are false and misleading with respect to material facts and which omit to state the material facts necessary in order to make the statements therein not false or misleading, in violation of Rules 14d–6(e)(1) and 14d–9." [8]

■ Section 14(d), like Section 14(e), was enacted as a part of the Williams Act, and imposes upon tender offerors various disclosure and reporting requirements. The defendants argue and Kalmanovitz concedes that the same analysis applied by the Supreme Court in *Piper v. Chris-Craft* dictates whether or not Kalmanovitz can maintain claims predicated on alleged violations of Section 14(d). Like subsection (e), subsection (d) was enacted to provide adequate protection for investors, and not to enrich disappointed competing tender offerors. In *Luptak v. Central Cartage Co.,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,034 (E.D.Mich.1979), *aff'd,* 647 F.2d 165 (6th Cir.1981), plaintiff was an unsuccessful competitor for control of Detroit International Bridge Company ("DIBC") who brought suit against other bidders who had obtained control over DIBC. In disposing of plaintiff's claims based on Section 14(d) as well as Section 14(e), the Court held:

Under the Supreme Court's rationale in *Chris-Craft,* emphasizing that section 14

and other provisions of the Williams Act were intended to benefit shareholders rather than competing offerors, Luptak would appear to have no standing to bring a private action for money damages under any subdivision of section 14. *See* 430 U.S. at 35 [97 S.Ct. at 946].

\*　\*　\*　\*　\*　\*

Because this Court has found both that plaintiff has no standing to assert his claims under section 14 of the Exchange Act and that Cartage's market purchases of DIBC stock did not constitute a tender offer under section 14, it must determine that defendants Cartage and Centra are entitled to judgment as a matter of law on those portions of plaintiff's complaint alleging violations of section 14(d) and (e) of the Act and the rules promulgated thereunder.

*Id.,* ¶ 98,034 at 91,352–54.

Thus, for the same reasons plaintiffs lack standing to maintain an action under Section 14(e), plaintiffs likewise have no standing to bring an action for damages under Section 14(d) and Count II will be dismissed as well.

c. *Counts III and IV: No Private Right of Action For Damages Under Section 13(e)*

■ In Counts III and IV of the Complaint, Kalmanovitz alleges violations of Section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e). (Count III—Disguised Issuer Tender: Section 13(e) of the Exchange Act and Rule 13e–4; Count IV—Disguised "Going Private" Transaction: Section 13(e) and Rule 13e–3.) (D.I. 1 at 17, 19.) The defendants argue that Kalmanovitz lacks standing to seek money damages for the alleged violations of Section 13 because under Section 13 there is no private right of action for *money damages.* Kalmanovitz disagrees.

Section 13(e) of the Exchange Act provides in pertinent part:

---

**8.** Kalmanovitz argues that he has standing to bring an action for money damages for violations of Section 14(d). However, he fails to cite

and the Court has not found any authority to support his claim.

It shall be unlawful for an issuer ... to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the Commission, in the public interest or *for the protection of investors,* may adopt (A) to define acts and practices which are fraudulent, deceptive, or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices. (Emphasis added.)

Section 13(e), like any other section of the Williams Act (15 U.S.C. § 78m(d)–(e), 78n(d)–(f) (1976)), does not *expressly* afford a private right of action for enforcement of its provisions. Thus, this Court is again faced with the issue: whether or not there is an implied private right of action for *money damages* under Section 13(e) of the Exchange Act. Neither the United States Supreme Court nor the Third Circuit Court of Appeals has determined whether an implied private right of action exists under Section 13(e). As a result, both Kalmanovitz and the defendants look to the case law under Section 13(d) for guidance.

This Court, in *Jacobs v. Pabst Brewing Co.,* 549 F.Supp. 1050 (D.Del.1982), a case arising out of the same battle for control of Pabst, presented a comprehensive analysis of Section 13(d) which included an exhaustive list of cases from various jurisdictions which stated that parties may and may not pursue a claim under Section 13(d).[9] This Court then reviewed the case history and the legislative history of Section 13(d) before concluding that "Congress intended to preserve a private cause of action which had been judicially created." 549 F.Supp. at 1062. Having determined that an implied right of action for *injunctive relief* exists under Section 13(d) and 13(g), the Court went on to determine whether the Jacobs Group, as shareholders, has standing to bring an action for injunctive relief against an investment adviser.

In the present action, however, this Court must decide whether or not an implied private right of action for *money damages* under Section 13(e) exists before it reaches the issue of standing.

When other courts have faced the issue of whether there is an implied private right of action for damages, they have determined that none exists. In *duPont v. Wyly,* 61 F.R.D. 615 (D.Del.1973), Judge Stapleton determined that no implied right to recover damages existed when he stated: "By including an express and expressly limited private remedy in Section 18, [15 U.S.C. § 78r] I think Congress clearly negated the existence of a further implied remedy for violation of Section 13. I agree that 'where Congress has specifically authorized a remedy for violation of an act, the courts should not nullify the congressional scheme by implying a right of action on behalf of those not otherwise entitled to recover.' " 61 F.R.D. at 628 *citing In re Penn Central Securities Litigation,* 347 F.Supp. 1327, 1340 (E.D.Pa.1972), *modified,* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,980 (E.D.Pa.1973). *See also Schnell v. Schnall,* 550 F.Supp. 650 [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,927 at 90,715–16 (S.D.N.Y.1981), and *Berman v. Metzger,* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,857 at 90,293–94 (D.D.C.1981) (federal courts applied the rationale of *Piper v. Chris-Craft* and held that Section 13 does not provide a private right of action for money damages); *Myers v. American Leisure Time Enterprises, Inc.,* 402 F.Supp. 213 (S.D.N.Y.1975), *aff'd,* 538 F.2d 312 (2d Cir.1976); *Crane v. Harsco,* 511 F.Supp. 294 (D.Del.1981) (tender offeror possessed no private cause of action for an injunction under 13(e) *as a stockholder* since he was not a stockholder to whom a tender offer had been made and, thus, not an intended beneficiary of the Williams Act).

In recent decisions, the United States Supreme Court has clearly stated that a private right of action for money damages will *not* be judicially implied unless there is a clear mandate from Congress concerning the relevant statute which either creates or alters civil liabilities in addition to a legislative history which contains some expression of Congressional

---

**9.** 549 F.Supp. 1050, 1054, n. 3, 4.

intent to imply a private remedy. If the language of the statute and legislative history is silent, particularly if the statute contains other sections which include express provisions for enforcement and remedies, no right of action for money damages will be implied. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (no private right of action for damages under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 (1976)); and *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (no private right of action under Section 17(a) of the Exchange Act, 15 U.S.C. § 78q(a) (1976)).

Because the legislative history of the 1934 Exchange Act is silent on the issue of whether a private cause of action for damages should be available under Section 13(e) [10] and in light of the recent Supreme Court decisions which refuse to imply a private right of action for damages, the mandate to this Court is clear. Moreover, because Courts imply equitable remedies under the securities laws more readily than money damage remedies,[11] this Court finds that no private right of action for money damages exists under Section 13(e).

d. *Count V: Fraud in Connection with the Purchase and Sale of Securities: Section 10(b) of the Exchange Act*

■ In Count V of the Complaint, Kalmanovitz alleges that:

The defendants have knowingly, by instrumentalities of interstate commerce, employed devices, schemes and artifices to defraud; made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; engaged in acts, practices and a course of business which operate and will operate as a fraud and deceit upon the Pabst stockholders and others in connection with each and every purchase and sale of securities contemplated by the Heileman Offer and the Agreement in Principle, which purchases and sales will ultimately be paid for with assets belonging to Pabst stockholders which have been wrongfully and fraudulently misappropriated by the defendants.

(D.I. 1, ¶ 69.) Section 10 of the Act, 15 U.S.C. § 78j, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\*　\*　\*　\*　\*　\*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 of the Commission, 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

---

10. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 31–32, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977).

11. *See Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 18–19, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979).

The defendants argue that because Kalmanovitz did not tender his shares pursuant to the HBC Offer, he is neither a purchaser nor seller of securities and therefore lacks standing to maintain an action for damages under either Section 10(b) or Rule 10b–5. In support of its position, defendants rely on *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), where the United States Supreme Court held that one who does not buy or sell stock in connection with an offer cannot maintain an action under Section 10(b) for alleged misstatements made by the offeror. Conceding that he must comply with the purchaser/seller requirement of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), Kalmanovitz contends that the words "in connection with the purchase or sale of any security" in Section 10(b) are to be construed so liberally as to encompass the conversion of his stock in the March, 1983 merger, which occurred more than four months after his complaint was filed. Relying upon the "forced seller" exception established in *Vine v. Beneficial Finance Company*, 374 F.2d 627 (2d Cir.1967), Kalmanovitz argues that a merger following a tender offer in which the majority stockholder may eliminate the minority stockholders without their approval relieves a stockholder of the need to plead "purchase or sale" of securities or "reliance." Because *Vine v. Beneficial Finance Company* was decided by the Second Circuit Court of Appeals prior to the 1974 Supreme Court decision of *Blue Chip Stamps v. Manor Drug Stores*, and because *Vine* is not the law in this Circuit, the Court is not persuaded by Kalmanovitz's argument.

In *Blue Chip Stamps*, the complaint alleged that the offeror had intentionally made the prospectus "overly pessimistic in order to discourage [complainant] and other members of the allegedly large class whom it represents from accepting what was intended to be a bargain offer, so that the rejected shares might later be offered to the public at a higher price." 421 U.S. at 726, 95 S.Ct. at 1921.

The Supreme Court held that the issue before it was: "[w]hether respondent may base its action on Rule 10(b)–5 of the Securities and Exchange Commission without having either bought or sold the securities described in the allegedly misleading prospectus." 421 U.S. at 727, 95 S.Ct. at 1921.

In a comprehensive opinion which traces the purpose of Section 10(b) and Rule 10(b)–5 and the judicially created cause of action to which they give rise, the Supreme Court, adopting the rationale of *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), held that *only actual* purchasers or sellers of a security, relying upon an alleged violation of Section 10(b), may bring an action for money damages based upon Section 10(b). (Emphasis added.) *See Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir.1982); *Sanders v. Thrall Manufacturing Co.*, 582 F.Supp. 945 [1983 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,500 (S.D.N.Y.1983); *see also Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 156–58 (3d Cir.1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

The Court in *Blue Chip Stamps* stated very clearly the guidelines [12] for Section 10(b). "The wording of § 10(b) directed at fraud 'in connection with the purchase or sale' of securities stands in contrast with the parallel antifraud provision of the 1933 Act, § 17(a), as amended, 68 Stat. 686, 15 U.S.C. § 77q, reaching fraud 'in the offer or sale' of securities.... When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly." 421 U.S. at 734, 95 S.Ct. at 1925 (citations omitted).

The Court also stated that underlying policy considerations of the *Birnbaum*

---

**12.** The Court also noted that those who have a contractual right to purchase or sell securities have also been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b–5, not because of judicial conclusion that they were similarly situated to "purchasers" or "sellers" but because the definitional provisions of the 1934 Act grant them such a status. 421 U.S. at 751, 95 S.Ct. at 1932–33.

Rule advocate adherence to the rule. The Court then expressed its concern that the failure to follow the rule may result in "vexatious litigation" caused by a "widely expanded class of plaintiffs" bringing "strike" suits under Section 10(b) and Rule 10b–5. 421 U.S. 737–41, 95 S.Ct. at 1926–28. In recent Supreme Court decisions, the Court has refused to ignore the literal, "operative language" of the securities statutes and has denied plaintiffs the statutory construction which they desired but which conflicted with that literal language. *See Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *Santa Fe Indus. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Furthermore, the Court has refused plaintiffs' requests that it supplement the existing securities statutes by providing a private right of action by implication where the statute itself said nothing about such a right. *See, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 568–78, 99 S.Ct. 2479, 2485–90, 61 L.Ed.2d 82 (1979) (construing Securities Exchange Act § 17(a)); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–24, 100 S.Ct. 242, 246–49, 62 L.Ed.2d 146 (1979) (construing Investment Advisors Act § 206, 15 U.S.C. § 80b–6 (1976)); *Piper v. Chris-Craft Indus., Inc.*, 97 S.Ct. 926, 940–50, 51 L.Ed.2d 124 (1977) (construing Securities Exchange Act § 14(e)). While it is true that in many of these cases the Court supported its decisions with policy arguments and legislative history analyses, in most of them the Court emphasized that the language of the statute was at least the starting place of the Court's inquiry. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 16, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979); *Piper v. Chris-Craft*

*Indus., Inc.*, 430 U.S. 1, 24, 97 S.Ct. 926, 940, 51 L.Ed.2d 124 (1977); *Santa Fe Indus. v. Green*, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). In a number of these cases, the Court intimated that the statutory language alone could determine the meaning of the statute, at least where the construction sought by the plaintiff conflicted with the precise literal language of the existing statute. Thus, in *Blue Chip Stamps*, Justice Powell, concurring, said:

> The courts already have inferred a private cause of action that was not authorized by the legislation. In doing this, however, it was unnecessary to rewrite the precise language of § 10(b) and Rule 10b–5. This (rewriting of the statutory language, which the Court refused to permit) is exactly what respondent ... sought in this case.

421 U.S. at 759, 95 S.Ct. at 1936. (footnote omitted). The majority opinion in *Blue Chip Stamps* also recognized that in some circumstances the statutory language itself could be dispositive: "If Congress had legislated the elements of a private cause of action for damages, the duty of the judicial branch would be to administer the law which Congress enacted." *Id.* at 748, 95 S.Ct. at 1931.

When the Third Circuit Court of Appeals was faced with this issue, it refused to expand the rule beyond the exceptions noted by the Supreme Court. *See Pittsburgh Terminal Corp. v. Baltimore and Ohio Railroad Company*, 680 F.2d 933 (3d Cir. 1982) (the Court held that the conversion option in a convertible debenture qualifies as a contract for the purchase or sale of security).

Therefore, in the present case, this Court finds that Kalmanovitz failed to either purchase or sell any shares pursuant to the HBC Offer, and as a result, he lacks standing to maintain an action for money damages under either Section 10(b) or Rule 10b–5.[13]

13. The defendants also argue that: (a) plaintiff has failed to make his allegations with the requisite specificity and; (b) plaintiff failed to plead reliance. (D.I. 166 at 25–28.) Because the Court found that Kalmanovitz lacks stand-

e. *Count VI: Illegal Agreement to Vote Pabst Treasury Stock*

■ Although the parties did not address the issue, because the state and federal claims are derived from "a common nucleus of operative fact," this Court has the power and may exercise its discretion and consider the pendent state claim even though the federal claims are dismissed. *See generally United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965), and *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 587 F.Supp. 1112 (D.Del.1984).

■ In Count VI of his Complaint, Kalmanovitz alleges that: "If the terms contemplated by the Agreement in Principle and the Heileman Offer are consummated, the tendered shares of Pabst common stock will belong to Pabst or will be under the control of Pabst within the meaning of Section 160(c)." (8 *Del.C.* § 160) (D.I. 1, ¶ 73.)

Defendants argue that the tendered shares belonged to HBC at the time they were voted and because the plaintiff failed to allege that the Pabst shares HBC agreed to vote in the merger did not "belong to" Pabst, directly or indirectly, the plaintiff has failed to allege any basis for a violation of Section 160. (D.I. 166 at 32.)

Section 160(c) states:

(c) Shares of its own capital stock *belonging to the corporation or to another corporation*, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, *directly or indirectly*, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

8 *Del.C.* § 160(c) (emphasis added). Although the language of 8 *Del.C.* § 160(c) is unambiguous, there is a question as to the exact meaning of "directly or indirectly" and unfortunately the case law provides little guidance. In *Italo Petroleum Corp. v. Producers' Oil Corp. of America*, 20 Del.Ch. 283, 174 A. 276 (1934), the court was faced with an issue which arose under the predecessor to Section 160.[14] In that case, the court noted:

The statute prevents the voting either directly or indirectly by a corporation of its own stock belonging to it. What can "indirectly" mean unless it be some such thing as having stock belonging to the corporation held in some third party's name and having that third party vote it? It requires some moments of reflection to discover any other possible device of indirection which the corporation could conjure up. The thought I have given to the matter, which I confess has not been lengthy, has failed to suggest any other. There may be other methods. But the one suggested is so obvious that it is reasonable to suppose that it certainly was dominant in the legislative mind when the section was enacted.

There can be no doubt that if a corporation acquired its own stock and caused it to be held in the name of an individual who would vote it as ordered by the corporation's directors, the vote of the individual would be the vote, indirectly given, of the corporation. Nor can there be any doubt that if a corporation planned to buy its own stock and its directors, desiring to vote that stock in violation of the statutory inhibition, organized a wholly owned subsidiary to hold the stock and vote it, the scheme would prove abortive. It would be so crude as to lack even the merit of cleverness. The fiction of the corporate entity would in that case be brushed aside and the device unhesitatingly pronounced but

ing to sue as a "purchaser or seller," the Court need not reach defendants' other arguments.

**14.** Although *Italo Petroleum Corp.* deals with a statute which was later amended to the current edition of Section 160, subsection (c) existed in the wording of the statute *prior to* the amendment.

a mere scheme for the indirect voting by the corporation of its own stock in violation of the statute.

174 A. at 278.

It is defendants' position that there is nothing in the Complaint to support the allegation that Pabst directly or indirectly owned or controlled the shares purchased by Heileman and subsequently cancelled in the merger. Although there are allegations of an agreement between Pabst and Heileman, the agreement does not rise to the level of control, domination and dictation consistent with a parent-subsidiary relationship noted in *Italo Petroleum Corp.*

As a result, plaintiffs' claim that the defendants have violated 8 *Del.C.* § 160(c) of the Delaware Corporation Law will be dismissed.

### f. *Count VII: Smith's Breach of Fiduciary Duty*

In Count VII of the Complaint (D.I. 1, ¶¶ 76–82), plaintiffs allege that defendant Smith, the Chief Executive Officer of Pabst, breached his duty to the Pabst shareholders under Delaware law. Before reaching the merits, the Court must first determine whether the plaintiff has standing to bring this action.

#### (1) *Derivative Nature of the Action.*

**[11]** Whether a claim is individual or derivative is determined from the body of the complaint, not the label employed by counsel. *Crane v. Harsco,* 511 F.Supp. at 304. Plaintiffs' claim here is that Smith breached his fiduciary duties to Pabst and its shareholders "through the mismanagement, waste and conversion of assets." (D.I. 1, ¶ 82.)

Although Kalmanovitz purports to bring these claims both individually and derivatively on behalf of the corporation, it is clear from every claim alleged by Kalmanovitz under Count VII that it constitutes a derivative claim because each alleged injury is one which would be suffered by all the stockholders of Pabst due to their status as stockholders and not as the result of any unique relationship with the corporation. *See Elster v. American Airlines,* 34

Del.Ch. 94, 100 A.2d 219, 222 (1953); *Bokat v. Getty Oil Company,* 262 A.2d 246, 249 (Del.Supr.1970).

The plaintiffs' standing to pursue derivative claims alleging violations of Delaware common law is also a question of substantive Delaware law. *See Crane v. Harsco,* 511 F.Supp. at 304 (alleged violations of Delaware law in connection with a tender offer were reviewed under Delaware law). It is well established under Delaware law that a plaintiff who brings a derivative suit on behalf of a corporation must be a stockholder of the corporation at the time he commences the suit and must maintain that status throughout the course of the litigation. *Lewis v. Anderson,* 453 A.2d 474 (Del.Ch.1982), *aff'd,* 477 A.2d 1040 (Del.1984); *Heit v. Tenneco,* 319 F.Supp. 884 (D.Del.1970).

In *Lewis v. Anderson,* the Delaware Supreme Court held that "a plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit...." 477 A.2d at 1049. *Lewis v. Anderson,* a suit by a Conoco stockholder alleging derivative claims was dismissed when, subsequent to the filing of the suit, a third party (DuPont Holdings, Inc., a wholly-owned subsidiary of E.I. duPont de Nemours and Company) acquired all of the outstanding stock of Conoco through a tender offer followed by a merger. The court, in its analysis, stated:

[T]he right to a pending cause of action is an asset of the merged corporation which passes to the corporation surviving the merger. Under the facts of this case, any right to equitable relief possessed by the original Conoco against the individual defendants, its officers and directors, passed to DuPont Holdings, and thus to the present Conoco, by virtue of the merger. Likewise, by the terms of the same merger, the plaintiff Lewis ceased to be a shareholder of Conoco—either new or old—and instead became a shareholder of Du Pont. The company of which the plaintiff is now a shareholder, Du Pont, now owns all of the stock of

the present Conoco and, if the original Conoco had a claim for relief against its former officers and directors for the reasons set forth in the Complaint in this action, that claim is now owned by the present Conoco. The shareholder beneficiary of such a claim is now Du Pont, and not the plaintiff Lewis and the other shareholders of the original Conoco as was the situation when the suit was filed.

477 A.2d at 1043.

The court recognized only two exceptions to this rule—where the merger itself is the subject of a claim of fraud (i.e., a device to eliminate the derivative litigation) or where the merger is a holding company reorganization which does not affect plaintiff's ownership of the business enterprise. 477 A.2d at 1046, n. 10. Neither exception is applicable in this case. As in *Lewis*, "plaintiff has not asserted that the merger was perpetrated [to deprive Pabst] of its claim against the individual defendant and the merger was clearly not a reorganization resulting in a holding company...." *Id.* See also *Schreiber v. Carney*, 447 A.2d 17, 21–22 (Del.Ch.1982).

The plaintiffs also allege in a conclusory fashion that unlike the plaintiff in *Lewis*, Kalmanovitz attacks the fairness of the merger and wrongdoing by the acquiring corporation. In addition, after stating the two exceptions to the rule regarding standing and mergers, Kalmanovitz concludes:

These exceptions are both applicable to this case. Plaintiff here possesses the same equitable derivative standing as the plaintiffs in the above cited cases. The plaintiff should have standing to maintain a derivative suit to correct an alleged breach of fiduciary duty.

Plaintiff possesses equitable derivative standing to bring this claim against defendants Smith. Plaintiff falls within the standing exception of both *Bokat* and *Schreiber*. Accordingly, defendants' motion to dismiss must be denied.

15. Because the Court finds that Kalmanovitz no longer has standing to pursue the claim that defendant Smith had breached his fiduciary duty to the Pabst shareholders, this Court need not reach defendants' other arguments that the derivative claims must be dismissed because:

(D.I. 168 at 30.) Needless to say, without any factual support, this Court is not persuaded by plaintiffs' "arguments."

However, the Court does find that as a result of the merger, Kalmanovitz has ceased to have any equity interest, direct or indirect, in Pabst. Plaintiffs' claims do not fit within either exception to the broad rule that a plaintiff who, as a result of a merger, loses his stockholder status, loses his standing to pursue derivative claims. As a result, Count VII must be dismissed due to plaintiffs' lack of standing.[15]

### g. *Count VIII: Conspiracy*

 Count VIII of the Complaint alleges *in toto:*

83. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 82 as if fully set forth herein.

84. Each defendant has agreed and conspired with one or more of the other defendants to violate the laws of the United States and the State of Delaware, as set forth above.

(D.I. 1, ¶¶ 83–84.) It is a longstanding rule in the Third Circuit that a mere general allegation of conspiracy is insufficient. *Black & Yates, Inc. v. Mahogany Assoc.*, 129 F.2d 227 (3d Cir.1942); *Leeward Petroleum, Ltd. v. Mene Grande Oil Co.*, 415 F.Supp. 158 (D.Del.1976). A general averment of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient. As has been noted:

Generally, fraud, conspiracy and collusion must be charged by allegations of fact; and general allegations of fraud, fraudulent intent, and conspiracy or collusion, without a statement of supporting facts, are conclusions of law and are insufficient.

"(a) of plaintiff's unexcused failure to make a demand on the Pabst Board of Directors and; (b) plaintiff could not adequately represent the interest of the other stockholders." (D.I. 166 at 37–41.)

71 C.J.S. *Pleading* § 21. The plaintiffs must plead with particularity the "circumstances" of the alleged wrongdoing in order to place the defendants on notice of the precise misconduct with which they are charged. *See Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (3d Cir.1984). Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient. *See, e.g., James Julian, Inc. v. Raytheon, Co.*, 499 F.Supp. 949, 955 (D.Del.1980). To establish the specificity of their conspiracy allegations, plaintiffs do no more than refer the Court to the eighty-one paragraphs included, by reference, in Count VIII and state that they "give rise to an inference of conspiracy." [16] (D.I. 168 at 34.) Such an inference, even if it could be gleaned from the Complaint, would be no substitute for the requirement that the circumstances of the conspiracy be plead with specificity.

As a result, Count VIII will be dismissed.

h. *Count IX: Purported Threat to Competition—Claims Are Moot*

■ In Count IX of his Complaint, Kalmanovitz contends *inter alia* that "unless enjoined, the effect of the Heileman/Pabst Offer challenged herein will be substantially to lessen competition or tend to create a monopoly" in the malt beverage business due, essentially, to the combined resources of Pabst, Olympia and Heileman and the elimination of Pabst from the market. (D.I. 1, ¶¶ 116–19.) The claim is brought pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits corporate mergers or acquisitions the effect of which "may be to substantially lessen competition, or tend to create a monopoly." Plaintiffs unsuccessfully attempted to enjoin the HBC Offer in December of 1982. (D.I. 167, Ex. H.) Subsequently, the Pabst/Heileman transaction was consummated and both Heileman and HBC were removed from any stock ownership position in either Pabst or Olympia.

The sole basis of the plaintiffs' Count IX was plaintiffs' apparent apprehension of the imminent injury that Heileman's control of Pabst would purportedly cause in the market for malt beverages.[17] As this Court noted:

[M]ovants [Kalmanovitz and two of his brewing companies] have argued ... that the proposed Final Judgment [i.e., consent decree] would not effectively prevent Heileman from exercising control over all the assets of Pabst and Olympia. This contention, however, has by time gone by the board. With the consummation of the exchange transaction on March 19, 1983, Heileman has transferred all of its Pabst and Olympia stock to Pabst in exchange for the retained assets and Pabst *again has become an independent company beyond Heileman's control. At that point, any*

**16.** In support of the allegations in Count VIII, Kalmanovitz in a conclusory manner and without reference to any specific part of the Complaint states:

Plaintiff has pleaded conspiracy with great specificity. Plaintiff sets forth 81 paragraphs covering some 21 pages of specific facts before setting forth the conspiracy allegation. Plaintiff has set out the parties to the conspiracy, the period of the conspiracy, the object of the conspiracy and numerous certain actions of the conspirators taken to achieve that purpose. The allegations are precise enough to give rise to an inference of conspiracy and therefore defendants' motion to dismiss must fail.

(D.I. 168 at 34.)

**17.** For example, in D.I. 1, ¶ 104, plaintiffs allege that "a recent proposed Consent Decree between

Heileman and the Department of Justice will probably be rejected...." The Consent Decree was not rejected. In ¶ 109, plaintiffs allege "there is no assurance that the Pabst or Olympia mergers will be consummated on any basis or upon the same terms as described in the HBC/Heileman Offer." These mergers were consummated substantially in accordance with the terms of that offer with Heileman relinquishing all control over the operations of Pabst and Olympia. Again, in ¶¶ 113–16, plaintiffs contend that various regional markets will be seriously altered by "Heileman control of Pabst and Olympia" and offer figures demonstrating how the "combination" of these three impacts on the markets to lessen competition. No such "combination" ever occurred.

*previous concern about the adequacy of the proposed judgment in precluding Heileman from exercising any control over, or retaining any interest in, the non-retained assets has become moot.* (emphasis added)

*United States v. G. Heileman Brewing Co.,* 563 F.Supp. 642, 651 (D.Del.1983). The consent decree, as suggested, prevented Heileman from retaining any interest in or control over Pabst and Olympia assets except for specific assets acquired without governmental objection. (*Id.* at 644.)

Plaintiffs also argued that Count IX is not moot on the ground that post-acquisition evidence is "significant in determining the validity of the merger." However, plaintiffs ignore the fact that the post-acquisition evidence here conclusively demonstrates that the very basis for the Section 7 claim—that Heileman would continue to control all Pabst/Olympia assets—has evaporated. As this Court found in connection with the government consent decree proceedings, any claim based on that theory is now moot. *United States v. Heileman Brewing Co.,* 563 F.Supp. 642, 650 (D.Del.1983).

i. *Count X: Lack of Standing to Assert Violation of Section 7 of the Clayton Act*

 In Count X, Kalmanovitz again claims the right to sue the defendants under Section 7 of the Clayton Act, i.e., 15 U.S.C. § 18. Count X is based on a claim that, subsequent to a successful completion of the HBC/Heileman tender offer and the exchange of shares for assets with Pabst, what remains of Pabst/Olympia "will not be viable as a competitor" in the production, distribution and sale of malt beverages in the United States. (D.I. 1 at 31–32.) In order to have standing to sue under the antitrust laws, generally a plaintiff must adequately allege (1) a violation of the antitrust law; (2) injury to his business or property; and (3) a causal relationship between the violation of his injury, that is, that the injury complained of was caused by the antitrust violation charged. *See* Von Kalinowski, *Antitrust Laws and Trade Regulation, § 101.02, Standing to*

*Sue* (1983 ed.); *see, e.g., Loeb v. Eastman Kodak Co.,* 183 F. 704 (3d Cir.1910).

 Kalmanovitz's role as a competitor does not give him automatic standing to sue under the antitrust laws. *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300 [1984–1] Trade Cases (CCH) ¶ 65,866 (5th Cir.1984); *Pennzoil Co. v. Texaco Inc.,* [1984–1] Trade Cases ¶ 65,848 (N.D.Okla. 1984). Appropriate injury must be pleaded and the plaintiffs have failed to cogently claim how the alleged non-viability of the post-merger Pabst would in any manner *injure them.* Plaintiffs claim only that, as competitors, the "six separate and distinct injuries" contained in Paragraph 120 of Count IX, and incorporated by reference in Paragraph 120 of Count X, constitute the injury necessary to confer standing. (D.I. 168 at 36.) The alleged injuries set forth in Paragraph 119, however, are all premised on Heileman's continued ownership of Pabst, and are therefore inapposite to the Count X claim that competition will be lessened because the Pabst that remains, after the transactions with Heileman are completed, will not be a viable competitor.

With respect to the remaining effects alleged in paragraph 121 of Count X, there has been *no* attempt to show that *plaintiffs* have suffered any injury at all, let alone to make the required showing that plaintiffs have suffered *"antitrust injury,* which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Indeed, there is no way that plaintiffs could make the required showing, since the alleged antitrust violation is Pabst's weakness as a competitor and since such weakness would benefit, not hurt, its competitors such as Kalmanovitz. *See Schoenkopf v. Brown & Williamson Tobacco Corp.,* 637 F.2d 205 (3d Cir.1980).

Plaintiffs' theory of injury under Count X does not meet the threshold standing

requirements, therefore, Count X will be dismissed.[18]

Accordingly, the Court finding that Counts I through X are without merit, those counts will be dismissed and summary judgment entered thereon in favor of defendants and against plaintiffs.

## IV. PLAINTIFFS' RULE 54(b) MOTION TO CERTIFY

This consolidated litigation as above captioned originally consisted of three separate law suits. The first was the twelve count complaint filed in this Court as C.A. No. 82–797. The second was the two count complaint brought by plaintiffs in the United States District Court for the Northern District of California (the "California District Court"). (D.I. 41.) The third was brought by the plaintiffs in the Superior Court of California for the County of Marin (the "California State Court action"). Defendants thereafter removed the latter action to the California District Court, consolidated with the second action, and then upon defendants' motion transferred to this Court pursuant to 28 U.S.C. § 1404(a). (D.I. 70.) Upon the transfer of California actions here, those actions were consolidated with C.A. No. 82–797.

In *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 576 F.Supp. 922 (D.Del.1983), this Court dismissed Counts XI and XII of the complaint in C.A. No. 82–797 and both Counts of the California District Court complaint against all of the named defendants. (D.I. 139.) In accordance with this opinion, the Court will enter an order dismissing all of the remaining counts (Count I through X) of the complaint in C.A. No. 82–797 against all of the named defendants. These dismissals result in leaving only one claim outstanding and unresolved. The unresolved claim is found in the complaint originally filed by the plaintiffs in the California State Court action against only defendants Irwin Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay (the "Jacobs Group") for breach of contract. (D.I. 71, Ex. A.) In that complaint plaintiffs allege that the individuals of the Jacobs Group by a letter dated November 18, 1982, unconditionally bound themselves to pay plaintiffs fifty percent of all proceeds should the Jacobs Group sell its Pabst shares to others for more than $24 per share.[19]

■ Since plaintiffs' breach of contract claim against the Jacobs Group is the only one which remains unresolved in this consolidated litigation, the Court finds no just reason exists for delay in entering a final judgment on all claims which were dismissed on November 21, 1983, or by the order to be entered today. This is so because the major claims involving federal securities violations, antitrust violations and tortious interference with contract claims have already been timely decided. The sole remaining breach of contract claim is subsidiary and unrelated to those issues and it involves fewer than all the multiple parties to this suit. It would be unduly harsh and wholly unrealistic to delay an appeal on the major unrelated issues until after trial of the subsidiary breach of contract claim. Accordingly, the Court will enter a Rule 54(b) certification on the claims already decided.

**18.** Plaintiffs' answering memorandum cites *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), for the general proposition that "[c]ompetitors *may* be able to prove antitrust injury and thus have standing." (D.I. 168 at 36; emphasis added.) The parties do not disagree with this general proposition. However, in some circumstances, such as a boycott directed against a competitor of one of the parties to a conspiracy, the competitor is injured by the violation and has standing. *See, e.g., Klor's, Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Such is not the case here. Neither this general proposition nor *McCready* suggests that Kalmanovitz has standing on the facts which he alleges. Indeed, *McCready,* which held that a customer had sustained antitrust injury, did not in any way alter, but rather reaffirmed, the requirement of *Brunswick* that plaintiffs have suffered antitrust injury in the particular case in order to have standing. *See* 457 U.S. at 482–84, 102 S.Ct. at 2550–51.

**19.** On November 21, 1983, the Court denied plaintiffs' motion for summary judgment on their breach of contract claim because material facts were in dispute. *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 576 F.Supp. at 930–31.

An order will be entered in accordance with this Opinion.