## OTIS & CO. v. SECURITIES AND EXCHANGE COMMISSION.
### No. 7805.

Circuit Court of Appeals, Sixth Circuit.
Sept. 18, 1939.

Frank X. Cull, of Cleveland, Ohio (Bulkley, Hauxhurst, Inglis & Sharp, Richard Inglis, and Raymond G. Hengst, all of Cleveland, Ohio, on the brief), for appellant.

James A. Treanor, Jr., and James J. Caffrey, both of Washington, D. C. (Allen E. Throop, Thomas J. Lynch, and Herbert B. Cohn, all of Washington, D. C., on the brief), for appellee.

Before HICKS, SIMONS and ARANT, Circuit Judges.

ARANT, Circuit Judge.

Pursuant to Section 20(b) of the Securities Act of 1933, 48 Stat. 86, 49 Stat. 1921, 15 U.S.C. § 77t(b), 15 U.S.C.A. § 77t (b) and Section 21(e) of the Securities Exchange Act of 1934, 48 Stat. 899, 49 Stat.1921, 15 U.S.C. § 78u(e), 15 U.S.C.A. § 78u(e), the Securities and Exchange Commission brought suit to enjoin appellant from continuing activities alleged to violate Section 17(a) (2) of the Securities Act of 1933, 48 Stat. 84, 15 U.S.C. § 77q (a) (2), 15 U.S.C.A. § 77q(a) (2), and Section 9(a) (2) of the Securities Exchange Act of 1934, 48 Stat. 889, 15 U.S.C. § 78i (a) (2), 15 U.S.C.A. § 78i(a) (2). The trial court held that no violation of the Securities Exchange Act had been shown. However, it held that appellant had violated Section 17(a) (2) of the Securities Act and enjoined further violations thereof. This appeal is from the latter part of the decree.

Appellant contends that the facts found do not constitute a violation of Section 17 (a) (2) of the Securities Act; but argues that, even if there had been a violation of the Act, it was error to grant the injunction because the violation had ceased several months before suit was begun.

The provision of the Securities Act held to have been violated by appellant is as follows:

"Section 17 [77q]. (a) It shall be unlawful for any person in the sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly * * *

"(2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

There is no substantial dispute as to the facts.

Appellant and its predecessors have been engaged in investment banking and the sale of securities since 1899. Its main office is in Cleveland, and it has branch offices in other cities. Because it is a corporation, it is not eligible for membership in any stock exchange. Its principal business is that of underwriter and dealer in securities. It acquires large blocks of securities, generally from the issuer, but sometimes from individual holders, for distribution to its customers. It maintains a department which examines statistical information concerning securities that it may have under consideration for purchase and offer to its clientele. It also maintains an inventory of securities which it attempts to keep in proper balance with its sales requirements.

As a result of a conversation with one Coughlin, a large stockholder and director of the Murray-Ohio Manufacturing Company, on April 10, 1935, Daley, president of Otis and Company, became interested in the stock of the Murray-Ohio Company, then listed on the Cleveland Stock Exchange and quoted at $3 a share. Having previously assisted this company, appellant had received its financial reports periodically for several years. The information thus acquired led Daley to believe that its stock, of which very little was being sold, was being offered below its intrinsic value and that its selling price would soon reflect the marked improvement in the company's economic condition. Consequently, early in June, 1935, he undertook to acquire a block of 10,000 shares of its stock for distribution in over-the-counter sales. There were then outstanding only 60,000 shares and almost one-half of them were held by a few large stockholders. Daley approached these stockholders and induced five of them, on June 25, 1935, to agree to sell appellant 4,918 shares at $10.50, the current exchange quotation, one-half of which was to be delivered and paid for on or before July 8 and the balance on or before July 20, 1935. None of these stockholders was then willing to sell more of his holdings. The contract with each contained the following provision: "I will not sell any of the balance of my stock prior to sixty days from this date without your written consent." None of this stock was offered for sale during the sixty-day period.

Another stockholder, Bernet, who controlled 2,500 shares, declined at that time to sell any of his stock and promised to sell none for sixty days unless he did so through appellant. He died shortly thereafter and, without knowledge of this promise, his son ordered the sale of 1,025 shares on the Cleveland Stock Exchange. Appellant had purchased 460 of these shares before their source was ascertained. Young Bernet was then informed of his father's promise and immediately cancelled his sale order as to the balance; however, he sold the remainder shortly after the expiration of the period covered by his father's promise.

Two other stockholders whose holdings aggregated 7,200 shares were approached on behalf of appellant but declined to sell, and none of their stock came into the market during the sixty-day period stipulated in the withholding agreements mentioned above.

Shortly after the April 10 conversation between Coughlin and Daley, referred to above, appellant made an investigation of Murray-Ohio stock, decided that it would be an attractive investment for its customers, and entered the market on May 9, buying at 4½. From that date until the middle of November, appellant dominated the buying side of this stock on the Cleveland Stock Exchange. From May 9 to June 25, 1935, it purchased 82% of the stock sold on the Exchange; from June 25th, when the withholding agreements were made, to August 26, when they expired, it purchased 91%; in September, October and November, it purchased 62%. Its purchases ceased on November 20, 1935, two days after the Securities and Exchange Commission began an investigation of its activities in Murray-Ohio stock.

Between May 9 and November 20, the exchange quotation rose from 4½ to 19.

On June 25, 1935, appellant began its over-the-counter distribution of the 4,918-

share block of stock through its several offices. The sales kit, dated June 25, 1935, and similar memoranda were mailed to its customers and to its salesmen, who were authorized to use it as a basis for their sales talk and to issue copies to customers on request.

These memoranda stated that appellant recommended Murray-Ohio stock as "an attractive speculation at current price levels," stated that "higher earnings for the company * * * should affect the market price accordingly," and offered the stock "at the market." There was evidence that appellant's salesmen called these statements to the attention of customers when the stock was being offered and sold. From June 26 to July 10, it distributed 4,-934 shares at approximately the price quoted on the Cleveland Stock Exchange.

The Commission charged that appellant in its over-the-counter sales, failed to disclose all material facts necessary to prevent the representations made from being misleading, as required by Sec. 17(a) (2) of the Securities Act.

Appellant contends that it was not required to disclose either the withholding agreements or its purchasing activities. Withholding agreements were said to be a commonly used method of stabilizing the market, and their use for this purpose beneficial to both distributor and purchaser. It was also argued that purchases for the purpose of stabilization are approved by the Securities and Exchange Act of 1934 and legal under either Act when made for the purpose of replenishing supply.

The trial court found that appellant made no disclosure of its withholding agreements or of its extensive stock exchange purchases while its salesmen, pursuant to its instructions, were offering the stock "at the market." The Court said:

"I agree with counsel for plaintiff that these references to market price and current price levels could refer only to stock exchange quotations and that these imply 'a price standard which normally reflects the operation of a free and open market in the sale and purchase of securities.' And that the defendant's customers by such omission to state the facts respecting withholding agreements and the market price situation, were led to believe that they were paying a price established in the normal way on the stock exchange without having been affected by artificial restriction of supply, and without stimulation of demand substantially by the defendant alone. The withholding agreements kept 17,000 out of 60,000 shares off the market while defendant was disposing of its approximately 5,000 shares. This in itself was a material fact which I think the law requires shall be communicated to defendant's customers. Plaintiff claims a much larger proportion of shares was withheld; I have some doubt as to whether some 42% of the stock was really withheld; but regard the exact proportion unimportant in view of the undoubted withholding of the above amount."

[1, ■ With this view we find ourselves in agreement. The statute did not require appellant to state every fact about stock offered that a prospective purchaser might like to know or that might, if known, tend to influence his decision, but it did require appellant not "to obtain money or property by means of any untrue statement of a material fact *or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."* (Our italics.)

Appellant's offer of Murray-Ohio stock "at the market" was doubtless understood and intended to be understood to refer to current stock exchange quotations and implied a price standard that reflected the operation of a market that was free and open, at least as far as appellant was concerned. Appellant had agreements not to sell for sixty days from five stockholders, who owned 17,000 shares, and a promise from Bernet, who controlled 2,500 shares, that he would not sell except through appellant. It thus had control for the sixty-day period of approximately one-third of all the outstanding stock, besides assurance or reason to believe that some 10,000 other shares would not come into the market. That these agreements had some effect in restricting the supply of the stock offered is not a matter of doubt. The Bernet promise enabled appellant to procure the withdrawal of 565 shares from the market. It thus appears that appellant not only had power to control supply, but used it. That such a situation is contrary to the implications of appellant's offer to sell "at the market" when it was stating that "higher earnings for the Company * * * should affect the market price of this stock accordingly" is, we think, obvious.

■ However, while appellant was thus restricting the market supply, its buying

activities were purposefully stimulating demand. Its procurement of the withdrawal from the market of the Bernet stock we think strengthens this inference as to intention that legitimately flows from appellant's domination of the market as purchaser from May 9 until the middle of November, and more especially from the fact that, during the period from June 25 to August 26, covered by the withholding agreements and the Commission's charges, it purchased 91% of the shares sold on the exchange, and, from July 9 to August 26, it purchased every share sold. When appellant entered the market as purchaser on May 9, it bought at 4½. By May 31, the price was 8½; on June 21 it was 10½ and on July 9 it was 16, a new high for the past three years that was maintained through August, then rose to 19 by September 30. We cannot accept the view that appellant's purchases during this time were solely for the purpose of replenishing its supply of stock. Indeed, it appears that appellant's position as respects this stock during July and August was always long; it was making market purchases faster than its supply was being depleted by over-the-counter sales. We do not assert that it was incumbent upon appellant to disclose the fact that it intended to make any purchases at all of the stock in question, but its failure to disclose purchasing activities that had stimulation of demand as their objective was a concealment of a fact necessary to prevent the implications of appellant's offer to sell "at the market" from being misleading and, in consequence, a violation of the statute.

■ Appellant has argued that there was no clear indication that it had procured sales of stock "by means of" its omission to reveal the withholding agreements and its purchasing activities. We have held that appellant's offer to sell "at the market" must have been understood to imply a price fixed by supply and demand free from artificial restriction and intentional stimulation, at least as far as appellant was concerned. Since price is of major significance in sales, it, as thus understood, unquestionably was an influential factor in inducing purchasers to buy, and we think it unnecessary to introduce testimony of particular purchasers, as contended by appellant, to show that they would not have purchased had they known of the withholding agreements and appellant's purchasing activities. It is enough that purchasers would understand that the stock was being offered at a price that had not been purposefully influenced by appellant.

Was the lower court's issuance of an injunction under the circumstances justified?

Section 20(b) of the Securities Act of 1933, under which the Commission proceeded, provides: "Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this title [subchapter], or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond."

■ Relying upon Securities and Exchange Commission v. Torr, 2 Cir., 1937, 87 F.2d 446, decided since suit began, appellant contends that an injunction is authorized under Section 20(b) only if one is "engaged" in or "about to engage" in a prohibited act or practice *at the time suit is begun*. For this contention we see no warrant in the language of the Act, nor do we find in its implications any support therefor. On the contrary, its necessary implications indicate the error of appellant's contention.

■ This statute should be so construed as to achieve the purpose of its enactment if its language is susceptible of such a construction. The obvious purpose of the Congress in its enactment was protection of the investing public. But, in view of the practical necessity of an investigation by the Commission prior to its institution of any proceeding, it is clear that, if the construction contended for by appellant were adopted the injunction provided for would be a remedy of slight efficacy. A dealer who saw the challenge of his activities that is implied in an investigation would probably discontinue them pending the investigation. It would seldom, if ever, be possible to show that a dealer was engaged in or about to engage in prohibited acts or practices when suit began, since the necessary investigation would nearly always have warned the dealer to desist. Consequently, while Section 20(b) does not *expressly* so provide, yet if it be assumed that it requires a showing that a dealer be "engaged" in or "about to engage" in prohibited acts or practices, we are of the opinion that it does not require that either

condition continue until the commencement of suit. It is clear that appellant was violating Section 17(a) (2) when the Commission began its investigation.

■ Moreover, if it be conceded that Section 20(b) requires, as a condition to the issuance of an injunction, that it appear not only that a person be "engaged" or "about to engage" in prohibited acts or practices but that this condition obtain when suit begins, we are of the opinion that the granting of an injunction in this case was not an abuse of discretion.

■ Appellant violated the Act each time a purchase of stock was made in reliance upon its offer to sell "at the market," as long as such offer was misleading; and this condition obtained as long as the market quotation reflected any purposeful stimulation by appellant. Appellant's market purchases continued until November 20, 1935, and its over-the-counter distribution until February, 1936. It is also apparent that its cessation of market-purchases did not prevent its subsequent over-the-counter sales from being in violation of the Act as long as the market quotation reflected any influence of appellant's past purchases. Consequently, its violations ceased only a short time before the institution of suit on April 1, 1936. We regard the conclusion of the District Court that appellant was "about to engage" in further violations as entirely reasonable. As already stated, each sale effected by a misleading statement constituted a violation of the Act. The numerous sales so made constituted a course of conduct in violation of the statute that commenced on June 25, 1935, and continued until some time after November 20, 1935. From such repeated unlawful acts, we think the inference is legitimate that a like course of conduct might be continued or resumed, and this probability is greatly increased by the fact that appellant has expressly asserted and vigorously defended the legality of its challenged activities. The opportunities of a large dealer in securities and the consequent temptation to promote its own interests by resort to similar practices with respect to other types of securities emphasize the imminence of danger to the public and the need for injunctive relief.

In summary, we are of the opinion that appellant's undenied course of conduct, and the inferences that flow therefrom, justified the issuance of an injunction under the authority of Section 20(b), as we interpret

it. However, if we had adopted the construction urged by appellant, our conclusion would be unchanged.

Since we have decided that an injunction was warranted under Section 20(b) of the Securities Act, it is unnecessary to consider the Commission's contention that appellant's past course of conduct would justify the issuance of an injunction upon general equitable principles.

The decree of the District Court is affirmed.