**HOWING CO., et al.,**
**Plaintiffs-Appellants,**

v.

**NATIONWIDE CORPORATION, et al.,**
**Defendants-Appellees.**

No. 85–3929.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 2, 1986.

Decided Aug. 7, 1987.

Rehearing and Rehearing En Banc
Denied Sept. 24, 1987.

William R. Jacobs argued, Strauss, Troy & Ruehlmann Co., L.P.A., Cincinnati, Ohio, for plaintiffs-appellants.

Jeffrey S. Davidson argued, Washington, D.C., for defendants-appellees.

Before MERRITT, GUY and NORRIS, Circuit Judges.

MERRITT, Circuit Judge.

Under § 13(e) of the Securities Exchange Act of 1934, a Williams Act provision enacted in 1968, a company that has issued publicly traded stock is prohibited from buying it back unless the issuer complies with rules promulgated by the SEC.[1] This appeal raises issues concerning the existence of a private right of action under § 13e–3, the nature of the disclosure duty imposed by Rule 13e–3,[2] and the interrelationship of this provision with other antifraud rules.

Pursuant to its authority under § 13e–3, the SEC has issued Rule 13e–3 and Schedule 13e–3, a long and detailed set of disclosure requirements governing such "going private" transactions. Schedule 13e–3 ac-

companying the Rule requires that numerous items of information about the transaction be filed with the Commission, including three items pertinent to this case, i.e., Items 7, 8 and 9. Item 7 covers the "reasons" for the transaction; Item 8 requires a statement concerning the fairness of the transaction; and Item 9 requires disclosure of appraisals and other information concerning the value of the stock. The Rule also provides that this same information be disclosed to the selling shareholders.

The basic questions presented in this case are: (1) whether the plaintiffs have a private right of action under § 13e–3 to police non-compliance with Rule 13e–3; (2) and if so, whether the disclosure requirements of Rule 13e–3 have been met; and (3) if those requirements have not been met, whether defendant's conduct in violating Rule 13e–3 also gives rise to liability under the antifraud provisions of Rules 10b–5 and 14a–9.

### Parties and Summary of Disposition Below

Defendant Nationwide Corporation is one of the largest life insurance holding companies in the United States. Originally incorporated in 1947 as Service Insurance Agency, the company has enjoyed steady growth since its affiliation with the Nationwide group of insurance companies in September 1955. As a result of this affiliation, the company adopted its present name and issued a special class of common stock (Class B common) which was held entirely by two Nationwide companies: Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company. The Class A common stock continued in the hands of individual shareholders.

---

1.  *See* 15 U.S.C. § 78m(e)(1)(1982) which authorizes the Securities and Exchange Commission in the going private context, to adopt rules and regulations "(A) to define acts and practices which are fraudulent, deceptive, or manipulative, and (B) to prescribe means reasonably designed to prevent such acts and practices." This section provides further that "[s]uch rules and regulations may require such issuer to provide holders of equity securities of such class with such information relating to the reasons

for such purpose, the source of funds, the number of shares to be purchased, the price to be paid for such securities, the method of purchase, and such additional information, as the Commission deems necessary or appropriate in the public interest or for the protection of investors. . . . "

2.  17 C.F.R. § 240.13e–3.

Because of the way voting rights were allocated between the Class A and Class B stock, complete ownership of the Class B shares gave Nationwide Mutual and Nationwide Mutual Fire effective control of the corporation. The Class B shares were entitled as a class to one-half of the voting power of the corporation as long as the percentage of Class B shares outstanding relative to outstanding shares of all classes combined did not fall below forty percent. Since it appears that the amount of outstanding Class B common was at all times sufficient to meet this threshold, Nationwide Mutual and Nationwide Mutual Fire held the same voting power as all the Class A shares combined. Under these circumstances, it is clear that these companies controlled the corporation despite wide public ownership of the Class A shares.

Nationwide Mutual and Nationwide Mutual Fire began to eliminate public ownership of Nationwide Corporation in December 1978 when these companies made a tender offer to buy the Class A shares for $20.00 per share net in cash. By January 1979, Nationwide Mutual and Nationwide Mutual Fire had purchased 4,074,695 Class A shares through this offer. After the tender offer, Nationwide Mutual and Nationwide Mutual Fire continued to purchase shares in the open market at prices ranging between $22.50 and $24.62 per share. These transactions ultimately gave Nationwide Mutual and Nationwide Mutual Fire ownership of 85.6% of the Class A common stock formerly held by the public.

In November 1982, the Board of Directors of Nationwide Corporation approved a transaction in which Nationwide Mutual and Nationwide Mutual Fire would acquire the remaining Class A shares at $42.50 per share. As a result, Nationwide Corporation would become a wholly-owned subsidiary of the two mutuals, and would have no public ownership. This transaction was approved by 94.7% of the Class A shares. Plaintiffs in the present litigation abstained from voting their shares respecting the merger or seeking their appraisal remedy under state law.

The present class action began with an action by Belle Efros, a Nationwide shareholder, seeking a preliminary injunction with respect to a vote on the proposed merger. Following the denial of the Efros motion for a preliminary injunction, the merger was approved by 94.7% of the voted public shares. The District Court ultimately consolidated the Efros action with an action brought by the Howing Company and Douglas McClellan, two former shareholders of Nationwide. The District Court also later conditionally certified the case as a class action. The final amended complaint in this action raised claims under the Securities Exchange Act of 1934 §§ 10(b), 13(e), and 14(a) and rules promulgated thereunder as well as state law claims based on a breach of fiduciary duty.

The defendants moved for summary judgment and plaintiffs filed a cross-motion for partial summary judgment. The District Court granted defendants' motion, denied plaintiffs' cross-motion, and dismissed the amended complaint, 625 F.Supp. 146 (D.Ohio 1985).

The District Court identified compliance with Rule 13e-3 as the principal issue in the case. The District Court framed its scope of review as follows:

We therefore will review the proxy material of Nationwide Corporation to see if it meets the standards of disclosure required by Rule 13e-3. If in any instance there has been a failure to meet the standard, we will then examine whether such failure constitutes a material breach, and if we conclude that there is a jury question concerning the materiality of the breach, then, of course, there would be a genuine issue of fact to be determined.

625 F.Supp. at 151.

In reviewing the proxy statement's compliance with Rule 13e-3, the District Court begins with Item 7 of the Rule which essentially covers the "reasons" for the transaction. The District Court concluded that the proxy statement adequately disclosed the purposes of the transaction as well as its benefits and detriments. The District Court stated that "[w]e decline to

second guess the directors of Nationwide as to the stated purpose for the merger," 625 F.Supp. at 152, and stated further that "[w]e conclude that the detriments and benefits were adequately discussed in the proxy statement and that the gravamen of plaintiffs' argument on this issue is actually that the merger price itself was not fair to the public stockholders." *Id.* at 153.

With respect to the proxy statement's compliance with the Item 8 fairness disclosure, the District Court considered three contentions by plaintiffs: (1) the proxy statement did not sufficiently discuss the net book value, liquidation value, and going concern values of Nationwide shares; (2) the proxy statement did not explicitly state that Nationwide stock was "thinly traded"; and (3) the proxy statement did not sufficiently discuss the basis for the First Boston opinion letter.

On the question of valuation, the District Court noted that "the proxy statement contained extensive financial information necessary to compute the net book, liquidation, and going concern values of Nationwide shares." 625 F.Supp. at 155. The District Court found that the proxy statement met the requirements of Rule 13e-3 in this regard:

> Rule 13e-3 "merely requires that an opinion be given and the material factors on which it is based be disclosed." We conclude that defendants satisfied this requirement of Rule 13e-3 by listing the factors considered by the Evaluation Committee and by candidly stating that no specific weight was given to any one factor, but of particular importance in the consideration was First Boston's opinion and the fact that the merger price represented a premium over the market price of the stock.

*Id.*

With respect to the "thinly traded" nature of the stock, the District Court found that sufficient information was disclosed "to allow a reasonably prudent shareholder to make his own characterization of the market for the Nationwide stock." *Id.* at 156. Specifically, the District Court noted that the proxy statement disclosed that

"Nationwide Mutual owned 85.6% of the outstanding Class A shares, the number of publicly held shares, and that the stock was traded only in the 'over-the-counter market.'" *Id.* at 155–56.

Concerning the proxy statement's discussion of the First Boston opinions, the District Court addresses plaintiffs' contention that the proxy statement failed to set forth projected growth rates and increase of earnings. Relying on this Court's reasoning in *Starkman v. Marathon,* 772 F.2d 231 (6th Cir.1985), the District Court considered the omitted information to be "soft" information since "earnings and cash flow projections do not rise to the level of substantial certainty triggering a duty to disclose." 625 F.Supp. at 156 (citing *Starkman,* 772 F.2d at 242). Accordingly, the District Court concluded that defendants were not required to disclose projected growth rates and future increase of earnings.

The District Court also dismissed plaintiffs' argument that the First Boston opinion "should have disclosed information regarding comparable life insurance companies as such information would reveal the unfairness of the cash out price." 625 F.Supp. at 157. The District Court rejected plaintiffs' argument on the following grounds: "There is no indication that there was anyone or any other entity, besides Mutual, interested in purchasing Nationwide. Therefore, the alleged omission of 'comparable values' was immaterial and indeed such information may have been misleading if discussed." *Id.*

The District Court concluded overall that the proxy statement satisfied the requirements of Rule 13e-3. The District Court stated:

> Most important, there was sufficient information disclosed in the proxy statement to enable the stockholders to make an informed decision on what to do. It is the conclusion of the Court, therefore, that there is no genuine issue of material fact concerning the adequacy of the proxy statement when measured against the standards set forth in Rule 13e-3, and that any omissions pointed out by

plaintiffs were not material as defined by the Court in *TSC Industries, Inc.* [*Northway Inc.*], 426 U.S. [438] at 449, 96 S.Ct. [2126] at 2132 [48 L.Ed.2d 757 (1976)].

*Id.*

Finally, the District Court considered and rejected plaintiffs' state law claims. The District Court stated that "since there is no evidence of any breach of fiduciary duty owed plaintiffs by defendants, and the merger was neither unauthorized by statute, illegal nor ultra vires under Ohio corporation law, the Ohio statutory appraisal right constituted plaintiffs' exclusive state law remedy." *Id.* The District Court noted that plaintiffs failed to resort to the appraisal remedy.

### Private Right of Action Under § 13(e)

In the present case, we must decide a question of first impression in the federal courts of appeals: Does § 13(e) of the Securities and Exchange Act of 1934 allow a private right of action for damages? The District Court assumed that a private right of action exists, and we agree. Based upon our review of the statute, the legislative history, and the Supreme Court's decisions respecting private rights of action, we conclude that such a right of action does exist under § 13(e).[3]

The law relating to judicially-implied private rights of action under federal statutes has undergone a process of evolution over the past seventy years. When federal lawmaking was a less detailed and comprehensive endeavor, a private remedy was ordinarily presumed in favor of the class for whose benefit the statute was enacted. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 374–75, 102 S.Ct. 1825, 1837–38, 72 L.Ed.2d 182 (1982) (citing *Texas & Pacific Ry. Co. v. Rigsby*, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916)). As the complexity of federal legislation and volume of litigation increased, the liberal *Rigsby* rule became unworkable. A unanimous Supreme Court responded by modifying the law on implied private rights of action. The result, announced in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), was a four-part test that focused primarily on congressional intent. Under *Cort*, a private right of action exists where: (1) the plaintiff is a member of the class for whose especial benefit the statute was enacted; (2) there is any indication, explicit or implicit, of legislative intent to support such a remedy; (3) an implied private right of action is consistent with the purposes of the legislative scheme; and (4) the cause of action is not "one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

This decision and those following it, such as *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), were intended to suggest that Congress be more explicit about private remedies in future legislation. However, because the rule announced by *Cort* was such a departure from existing law, there has been some reluctance to apply it to legislation enacted prior to that decision. According to *Cannon*, Congress is entitled to rely on the "contemporary legal context" in which it acts, 441 U.S. at 698–99, 99 S.Ct. at 1958. When Congress passed legislation prior to *Cort*, that context would presume a private remedy if the statute and its history were otherwise silent. *See Curran*, 456 U.S. at 374–75, 382 n. 66, 102 S.Ct. at 1837–38, 1841 n. 66.

The decision in *Cannon v. University of Chicago* is particularly instructive. In that case, the Supreme Court held that Congress indicated its intent to allow a private right of action to enforce Title IX of the Education Amendments of 1972 when it

---

**3.** Two District Courts have split on the existence of a private right of action under § 13(e). *See Fisher v. Plessey Co.*, [1982–83 transfer binder] Fed.Sec.L.Rep. (CCH) ¶ 99,246 (S.D.N.Y. June 22, 1983) [Available on WESTLAW, DCT database] (implying private action). *But see Kal-* *manovitz v. G. Heileman Brewing Co.*, 595 F.Supp. 1385 (D.Del.1984) (denying right of action), *aff'd on other grounds,* 769 F.2d 152 (3rd Cir.1985). For a discussion of the error in the *Kalmanovitz* reasoning, see note 4 *infra.*

patterned that law on another statute—Title VI of the Civil Rights Act of 1964—which had been interpreted to support private suits. Although the *Cort* test was still applied, this adoption theory satisfied the crucial legislative intent test contained in the second *Cort* factor. Given a contemporary legal context in which Title VI had been construed to support a private cause of action, Congress' choice to pattern Title IX after that previous statute made it "not only appropriate but also realistic to presume that Congress was familiar with these unusually important precedents ... and that it expected its enactment to be interpreted in conformity with them." *Cannon*, 441 U.S. at 699, 99 S.Ct. at 1958.

In order to determine the existence of a private right of action under § 13(e), therefore, we must apply the criteria established by *Cort v. Ash* with consideration for the "contemporary legal context" in which the legislation was passed. Such an undertaking requires that we understand the history and the structure of the statute in question.

Section 13(e)(1) of the Securities Exchange Act was not part of the original statute but was added by the Williams Act in 1968. The stated purpose of the Williams Act was to protect investors from potential manipulation of tender offers and corporate repurchases of stock. *See Piper v. Chris-Craft Indus.*, 430 U.S. 1, 26–35, 97 S.Ct. 926, 941–46, 51 L.Ed.2d 124 (1977). The legislation was explicitly patterned after the statutes and regulations then governing proxy solicitations. *See* 113 *Cong. Rec.* 24,665 (1967) (statement of Senator Williams). As a result, the language of § 13(e) and other Williams Act provisions parallel that used in § 14(a) of the Securities Exchange Act of 1934.

From this legislative history, it is clear that the first three *Cort* factors are satisfied with respect to § 13(e). The first *Cort* factor applies the old *Rigsby* test and asks if the plaintiff is one for whose especial benefit the statute was enacted. Since the Supreme Court established in *Piper* that the Williams Act was intended "for the protection of investors," 430 U.S. at 35, 97 S.Ct. at 946, it cannot be gainsaid that the investors such as the current plaintiffs fall within the benefitted class. Thus, the first *Cort* factor is met.

The second *Cort* factor—whether there is evidence of a legislative intent to allow or deny a private remedy—favors a private cause of action for two distinct reasons. First, since the Williams Act was explicitly patterned on the proxy rules, the analysis employed by the Supreme Court in *Cannon v. University of Chicago* applies here. When § 13(e) was adopted in 1967, the Supreme Court had already recognized an implied private right of action under § 14(a) in *J.I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In support of the private action upheld in *Borak*, Justice Clark, speaking for the Court, placed special emphasis on the power granted to the SEC "to protect investors." *Id.* at 432, 84 S.Ct. at 1559. Under the rationale of *Cannon*, therefore, Congress indicated its desire to allow a private right of action under § 13(e) when it chose language that was identical to the crucial language supporting a private right of action under § 14(a). *See also Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (Congress presumed to incorporate interpretations of prior law when it incorporates text into new law).

Aside from Congress' choice of § 14(a) as a model, there is a second aspect of the "contemporary legal context" which supports a private right of action for § 13(e). At the time the Williams Act was passed, implied rights of action were in a heydey of sorts. *See Cannon*, 441 U.S. at 718, 99 S.Ct. at 1968 (Rehnquist, J., concurring); *Leist v. Simplot*, 638 F.2d 283, 316–17 (2d Cir.1980). Congress could have justifiably presumed that its silence with regard to private actions would be interpreted to indicate authorization. Silence, in the contemporary legal context of the Williams Act, did not constitute disapproval of an implied private action. Since there is no evidence of legislative intent to deny a private remedy, Congress' choice to incorporate the proxy rules without additional comment is an indication of legislative intent sufficient to satisfy the second *Cort* test. *See Can-*

*non,* 441 U.S. at 698–99, 99 S.Ct. at 1958–59; *Cort,* 422 U.S. at 82, 95 S.Ct. at 2089.

The third element of the *Cort* test—whether an implied private action is consistent with the legislative scheme—is also satisfied by § 13(e). Although the statute is designed for the protection of investors, no mechanism is provided by which these investors can vindicate their interests.[4] As noted by Justice Clark in *Borak* with respect to the proxy rules, private enforcement may be the *only* way to achieve the purposes of § 13(e) given limited resources under the SEC's command. *Borak,* 377 U.S. at 433, 84 S.Ct. at 1560. Under these circumstances, "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective ... congressional purpose." *Id.* Since a private right of action would fill a void in enforcement, it is entirely consistent with the legislative scheme established by § 13(e).

The fourth *Cort* factor concerns whether the cause of action is one traditionally relegated to state law. Since 1933, the obligations of an issuer to the public and its stockholders have been a matter of federal law. The specific disclosure duty at issue here is a federal law. In light of the inherently federal nature of this claim, it is clear that a private right of action would not interfere with the regulatory prerogatives of the various states. It is also clear that the plaintiffs in this case meet the requirements set forth by *Cort v. Ash* and its progeny, and are therefore entitled to maintain a private action against Nationwide for violations of § 13(e).

### *Rule 13e–3 Compliance*

Going private transactions raise unique problems because of their inherently coercive nature: minority shareholders are forced to exchange their shares for cash or other consideration. The coercive effect of these transactions is reinforced by the fact that the majority shareholders control the timing and terms of the transaction.

In promulgating Rule 13e–3 pursuant to § 13(e), 17 C.F.R. § 240.13e–3, the SEC recognized the potential for overreaching in going private transactions:

> The nature of and methods utilized in effecting going private transactions present an opportunity for overreaching of unaffiliated security holders by an issuer or its affiliates. This is due, in part, to the lack of arms-length bargaining and the inability of unaffiliated security holders to influence corporate decisions to enter into such transactions. Additionally, such transactions have a coercive effect in that security holders confronted by a going private transaction are faced with the prospects of an illiquid market, termination of the protections under the federal securities laws and further efforts by the proponent to eliminate their equity interest.

Exchange Act Release No. 34–17719, *reprinted in* 3 Fed.Sec.L.Rep. (CCH) ¶ 23,-709, at 17, 245–28 (April 13, 1981).

This Court has also recognized the special problems posed by going private transactions and the need for greater disclosure. In *Radol v. Thomas,* 772 F.2d 244, 255 (6th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986), the Court stated:

> The more extensive legal disclosure requirements which apply to freeze-out merger proxy statements are therefore justified by the fact that the law has given the majority the power to foreclose the ownership rights of the minority and has thereby eliminated the market as a correcting mechanism, leaving minority shareholders with only the option of dissent and appraisal, an option which cannot rationally be exercised unless the majority is compelled to make full disclosure regarding appraisals, earnings pro-

---

**4.** Section 18 of the Securities Exchange Act, 15 U.S.C. § 78r, provides an express remedy for some subsections of § 13, but not subsection (e). This remedy was provided prior to the Williams Act for misstatements in filings with the Commission. It does not apply where inad-

equate disclosure is made to shareholders. The critical error committed by the District Court in *Kalmanovitz v. G. Heileman Brewing Co.,* 595 F.Supp. 1385, 1393–1395, is the assumption that the § 18 remedy affords relief for aggrieved shareholders.

jections and other information that sheds light on the value of the firm.

Rule 13e–3 serves as the primary and most direct vehicle under the federal securities laws for mandating this disclosure in going private transactions. Subsection (e) of Rule 13e–3 prescribes which information from the issuer's Schedule 13e–3 filing with the Commission shall be provided to shareholders as well as the form and content of this public disclosure. *See* 17 C.F.R. § 240.13e–3(e). Subsection (e) mandates, for example, that where a going private transaction requires the use of a proxy statement, the Rule 13e–3 disclosure be presented in a "Special Factors" section of the proxy statement. 17 C.F.R. § 240.-13e–3(e)(1), (3)(i).

Rule 13e–3 does not require that the issuer's Schedule 13e–3 filing with the Commission be reproduced in its entirety in the communication with shareholders. Most items from that Schedule may be summarized. However, Items 7, 8 and 9 must be disclosed verbatim. The rationale behind complete disclosure of these items is that they go to the essence of the transaction. Item 7 requires full disclosure of the purposes, alternatives, reasons, and effects of the transaction; Item 8 requires a statement as to the fairness of the transaction and the factors upon which such belief is based; and Item 9 requires disclosure of reports, opinions, appraisals and certain negotiations.

### A. *Item 7 Disclosure*

██ Item 7 of Schedule 13e–3 requires that the issuer (1) state the purpose for the transaction, (2) discuss any alternative means considered, (3) state the reasons for the structure of the transaction and for its timing, and (4) describe the effects of the transaction on the issuer, its affiliates and unaffiliated security holders. Instruction 2 to Item 7 contains the following guidance: "The description required by Item 7(d) should include a reasonably detailed discussion of the benefits and *detriments* of the Rule 13e–3 transaction to the issuer, its affiliates and unaffiliated security holders. The benefits and detriments of the Rule

13e–3 transaction should be quantified to the extent practicable." (emphasis added).

In the proxy statement, defendants enumerated four reasons for undertaking the transaction: first, eliminating potential conflict of interest problems; second, increasing management flexibility in the insurance and financial markets; third, simplifying the management structure of the Nationwide companies as a whole; and fourth, eliminating the substantial costs of servicing its public shareholders. The proxy statement indicates that the Company considered the possibility of a further tender offer, but rejected this option since the Company did not believe it compared favorably with the going private route in achieving the Company's overall objectives. The proxy statement indicates further that the Company proposed the transaction when it did in order to "maintain their competitive position in the industry." The proxy statement also states that the "[i]nitial out-of-pocket savings to Nationwide Corporation are estimated to be $300,000 per year."

The gravamen of plaintiffs' case on Item 7 compliance appears to be that the proxy statement failed to disclose adequately the "detriment" to Nationwide Mutual of the transaction and thereby concealed the true purpose of the transaction. Plaintiffs argue that a "company does not sacrifice $3,000,000 of annual income in order to save $300,000 and to achieve other non-quantifiable benefits. Having determined that the stated benefits were not genuine, a shareholder would search for the true purpose of the transaction: to acquire the minority interest at a bargain price." Brief of Appellants at p. 37.

In reviewing defendants' Item 7 disclosure, we find as did the District Court that defendants have complied with this part of Rule 13e–3. Plaintiffs do not suggest specific reasons not enumerated by defendants for undertaking the transaction; their challenge on this point reduces to an attack on the substantive fairness of the transaction. Defendants have specified legitimate reasons for the transaction, and since plain-

tiffs bear the burden of proof on this issue, plaintiffs' Item 7 challenge must fail..

### B. *Item 8 Disclosure*

■ The instructions accompanying Schedule 13e–3 are quite definite in the level of specificity required in certain disclosures.[5] The Instruction to Item 8 states that "[c]onclusory statements, such as 'The Rule 13e–3 transaction is fair to unaffiliated security holders in relation to net book value, going concern value and future prospects of the issuer' *will not be considered sufficient disclosure in response to Item 8(a)."* (emphasis added.)

The Commission has expressed special concern with disclosures under Item 8(b) of Schedule 13e–3, the Item concerning the factors underlying a belief as to the fairness of the transaction. The Commission has issued the following guidance to prospective issuers:

> The Division is concerned that in many instances the Item 8(b) disclosure being made to security holders is vague and non-specific and is therefore of limited utility to security holders.... Each such factor which is material to the transaction should be discussed and, in particular, if any of the sources of value indicate a value higher than the value of the consideration offered to unaffiliated security holders, the discussion should specifically address such difference and should include a statement of the bases for the belief as to fairness in light of the difference.

Exchange Act Release No. 34–17719, at 17, 245–42.

The most serious problem in defendants' proxy statement concerns Item 8(b) compliance. Our review of the proxy statement indicates that defendants have made precisely the kind of conclusory statements prohibited by the Rule. In describing the fairness of the transaction as required by Item 8(b), defendants have done nothing more than provide a laundry list of factors considered by their investment banker.[6]

This kind of non-specific disclosure runs counter not only to the SEC's position taken in the Commission release discussed above but also to the Instruction to Item 8(b) of Schedule 13e–3. The Instruction states that the issuer shall "[d]iscuss in reasonable detail the material factors upon which the belief stated in Item 8(a) is based and, to the extent practicable, *the weight assigned to each factor."* (emphasis added). Thus, the proxy statement is incomplete in that we are not provided with any indication of the weights given the various factors as required by Rule 13e–3, incorporating Schedule 13e–3. Moreover, we therefore have no indication as to whether any of the "sources of value indicate a value higher than the value of the consideration offered to unaffiliated security holders." Exchange Act Release No. 34–17719, at 17, 245–42.

Instead of providing this itemized disclosure called for by Rule 13e–3, defendants rely heavily on the First Boston opinion letter to discharge their disclosure obligations.[7] Indeed, the proxy materials state

---

**5.** The Instructions to Item 8(b) of the Schedule identify the following factors to be discussed in the disclosure:

> Instructions. (1) The factors which are important in determining the fairness of a transaction to unaffiliated security holders and the weight, if any, which should be given to them in a particular context will vary. Normally such factors will include, among others, those referred to in paragraphs (c), (d) and (e) of this Item and whether the consideration offered to unaffiliated security holders constitutes fair value in relation to:
> (i) Current market prices,
> (ii) Historical market prices,
> (iii) Net book value,
> (iv) Going concern value,

> (v) Liquidation value,
> (vi) The purchase price paid in previous purchases disclosed in Item 1(f) of Schedule 13e–3,
> (vii) Any report, opinion, or appraisal described in Item 9 and
> (viii) Firm offers of which the issuer or affiliate is aware made by any unaffiliated person, other than the person filing this statement, during the preceding eighteen months ...

**6.** See Appendix A for the relevant language from the proxy statement.

**7.** See Appendix B for the language from the First Boston opinion letter which appears in the proxy statement as Exhibit II.

specifically, "Although the Evaluation Committee did not give specific weight to each of the various factors considered in evaluating the fairness of the proposed merger, particular emphasis was placed upon the receipt of the opinion of First Boston."

While the Commission has stated that an issuer in a going private transaction can rely on an investment banker's opinion to meet its disclosure obligations, such opinion itself must fully analyze the factors enumerated in Item 8(b) as well as be "expressly adopted" by the issuer. Exchange Act Release No. 34–17719, at 17, 245–42. The issuer in this case did not conduct its own investigation but chose to rely on the expertise of First Boston. The problem with defendants adopting the First Boston opinion letter as their disclosure to shareholders is that this one-page letter is itself woefully inadequate when measured against the specific disclosure requirements of the Rule. An issuer cannot insulate itself from 13e–3 liability by relying on an investment banker's opinion letter which itself does not comply with the specific disclosure requirements of the Rule. Therefore, defendants' conclusory statements are not cured by conclusory statements made by First Boston in its opinion letter.

Somewhere in the proxy materials the Nationwide shareholders should have received a reasonably detailed analysis of the various financial valuation methods discussed by the Rule and the weights attached thereto. Even if certain valuation methods were not particularly relevant, this should itself have been noted and explained. *See* Exchange Act Release No. 34–17719, at 17,245–42. Without this disclosure, Nationwide shareholders did not possess the information necessary to make an informed decision concerning the going private transaction.

### C. *Item 9 Disclosure*

■ Item 9 requires disclosure of various factors relating to appraisals by an outside party. For example, the issuer must disclose the identity of the outside party; the qualification of the outside party; the method of selection of the outside party; the relationship between the outside party and the issuer over the past two years or any relationship which is contemplated, and any compensation received or to be received; whether the issuer or outside party recommended the amount of consideration to be paid; and a summary of the appraisal.

In the section of the proxy statement entitled "Opinion of the First Boston Corporation," defendants appear to have covered all the elements required in Item 9 disclosure. The proxy statement, for example, reveals the following: First Boston had served as a financial advisor to the Nationwide companies on several matters in the recent past; First Boston recommended the cash-out price of $42.50; and Nationwide Mutual agreed to pay First Boston a fee of $175,000 in connection with the proposed merger as well as all reasonable out-of-pocket expenses, including counsel's fees. The proxy statement also reviewed the information reviewed and relied upon by First Boston.

Plaintiffs main argument on Item 9 compliance centers on one factor considered by First Boston and cited in defendants' proxy statement—"present value of projected future cash flows of the Corporation." Plaintiffs contend that "[s]ince the actual projection of increased revenue and earnings was the most important single basis for First Boston's recommendation, disclosure was required."

Plaintiff reads more into Item 9 than is actually required: the challenge to Item 9 compliance seems to constitute an Item 8 claim if anything. As the above discussion indicates, Item 9 requires the disclosure of procedural matters. Accordingly, since defendants appear to have complied with this Item, we find no problem in Item 9 compliance.

### D. *Rule 13e–3 Liability*

The basic problem with the disposition below is that the District Court did not engage in the detailed analysis required by Rule 13e–3, particularly with respect to

Item 8(b) of Schedule 13e–3. The District Court's error in this regard may stem from its reliance on the following language from this Court's decision in *Starkman v. Marathon*, 772 F.2d 231, 240 (6th Cir.1985): "[w]e have rejected the position that SEC rules regarding freezeout mergers and proxies should determine the disclosure obligations of target management in the first stage of a two-tier tender offer." *Starkman* is inapposite to the present case because this is not the first stage of a two-tier tender offer, but rather the second and final step in this process.

Subsection (b)(2) of Rule 13e–3 states that "it shall be unlawful for an issuer ... to engage, directly or indirectly, in a Rule 13e–3 transaction unless [the] issuer" ... complies with the filing, disclosure, and dissemination requirements of the Rule. As discussed above, defendants did not comply with the disclosure obligation imposed by the Rule—a failure declared unlawful by subsection (b)(2) of the Rule. Accordingly, since plaintiffs have a private right of action under § 13(e) to police such unlawful behavior, the District Court erred

in its disposition of plaintiffs' Rule 13e–3 claims.

### The Antifraud Claims

In addition to liability under subsection (b)(2) of Rule 13e–3, plaintiffs also contend that the defendants breached the antifraud provisions of Rules 10b–5,[8] 13e–3(b)(1),[9] and 14a–9.[10] In essence, plaintiffs contend that a failure to disclose information required by Rule 13e–3 *ipso facto* constitutes an "omission" actionable under the antifraud provisions. They argue that Rules 10b–5 and 14a–9 incorporate Rule 13e–3 by reference in the going private context.

The three antifraud provisions at issue here spring from distinct statutes which have unique texts and histories. All three, however, parallel the common law of fraud and deceit. Absent special circumstances, an action for deceit would lie at common law for both falsehoods and half-truths, but not for a complete failure to disclose. *See* III L. Loss, *Securities Regulation* at 1433–35. As was noted by this circuit almost fifty years ago with regard to a similarly worded antifraud provision in the Securities Act of 1933:

**8.** Securities Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5, reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

**9.** Securities Exchange Act Rule 13e–3(b)(1), 17 C.F.R. § 240.13e–3(b)(1), is virtually identical to Rule 10b–5 and reads as follows:

It shall be a fraudulent, deceptive or manipulative act or practice, in connection with a Rule 13e–3 transaction, for an issuer which has a class of equity securities registered pursuant to section 12 of the Act or which is a closed-end investment company registered under the Investment Company Act of 1940, or

an affiliate of such issuer, directly or indirectly

(i) To employ any device, scheme or artifice to defraud any person;

(ii) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(iii) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

**10.** Securities Exchange Act Rule 14a–9, 17 C.F.R. § 240.14a–9, reads as follows:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

The statute did not require appellant to state every fact about stock offered that a prospective purchaser might like to know or that might, if known, tend to influence his decision, but it did require appellant not "to obtain money or property by means of any untrue statement of a material fact *or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.*

*Otis & Co. v. SEC,* 106 F.2d 579, 582 (6th Cir.1939) (emphasis in original) (construing § 17(a)(2) of the Securities Act of 1933).

The second clauses of Rules 10b–5 and 13e–3(b)(1), and similar language in Rule 14a–9, adopt the common law rule and prohibit silence only where the omitted information is necessary to prevent inaccuracy in existing disclosure. As a result, these provisions have been considered by commentators and the courts alike to be concerned with half-truth rather than omissions *per se. See Myzel v. Fields,* 386 F.2d 718, 733 n. 6 (8th Cir.1967); *Trussell v. United Underwriters, Ltd.,* 228 F.Supp. 757, 767 (D.Col.1964); *Cochran v. Channing Corp.,* 211 F.Supp. 239, 243 (S.D.N.Y. 1962); *see also* III L. Loss, *Securities Regulation* at 1439; A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 2.6(2).

The essence of plaintiff's claim is that a failure to provide items of disclosure required by Rule 13e–3(e) always constitutes a material omission under the antifraud rules. This is tantamount to incorporating the disclosure provisions of the securities laws into the antifraud provisions. No longer would omissions be actionable only where a half-truth resulted. Instead, any failure to comply with SEC disclosure obligations would be actionable by private litigants under the antifraud provisions.

■ Although the antifraud rules are the "catch-all" provisions of the securities laws, the Supreme Court has emphasized in the Rule 10b–5 context that they apply only

where some fraud has been committed. *See Chiarella v. United States,* 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1117–18, 63 L.Ed.2d 348 (1980). Congress did not enact sections 10(b), 13(e), or 14(a) to give private litigants the same enforcement powers granted to the Commissioner of the SEC. Allowing private suits based on any non-disclosure, without regard to the "half-truth" limitation, would contravene the congressional intent behind these statutes. Therefore, we hold that omission of disclosure required by Rule 13e–3(e) will constitute a violation of the antifraud provisions of sections 10(b), 13(e), and 14(a) only where the information is necessary to prevent half-truth. The violations of Rule 13e–3, Item 8, itemized above, do not constitute "fraud" under sections 10(b) and 14(a) but should be considered as violations only of the specific rule in question.[11]

### Remand Order

The case is remanded to the District Court with instructions to reconsider defendants' failure to provide Item 8 information in the violation of Rule 13e–3, as established by this opinion. The District Court should also consider issues of materiality of the defendants' omission under Rule 13e–3. After reconsidering the federal claims under Rule 13e–3, the District Court should determine whether it is necessary to decide the alternative state claims respecting breach of fiduciary duty. If so, the District Court's disposition of the state claims should be accompanied by detailed findings of fact and conclusions of law concerning the state standard of fiduciary duty used by the Court.

Accordingly, the judgment of the District Court is reversed and remanded for proceedings consistent with this opinion.

GUY, Circuit Judge, concurring in part and dissenting in part.

Although I concur in most of Judge Merritt's well-written and thorough opinion, I disagree with the conclusions reached in

---

**11.** Under certain circumstances, violations of Rule 13e–3 may be indicative of a "scheme or artifice to defraud" which would violate the

antifraud provisions. Such is not the case here, however, where non-disclosure is claimed to be a violation standing alone.

Part B, Item 8, Disclosure. Since it is this part of the court's decision that results in this case being remanded, I must dissent.

I believe the district court properly analyzed plaintiffs' disclosure claims pursuant to Rule 13e–3, which sets forth disclosure requirements for going-private mergers, notwithstanding that the disclosure requirements under Rule 13e–3 are more detailed in a going-private transaction than in other types of mergers. *See Radol v. Thomas,* 772 F.2d 244, 254–255 (6th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3272, 91 L.Ed.2d 562 (1986) (as quoted in the majority opinion). Along with Rule 13e–3, the regulations provide an itemized list of information which must be included in the proxy statement. In accord with this list, plaintiffs' claims relating to alleged inadequate disclosure can be separated into three components. First, plaintiffs claim that the proxy statement did not adequately disclose the "benefits and detriments" of the merger. Second, plaintiffs claim that the proxy statement did not sufficiently explain why the merger occurred at the time that it did. Finally, plaintiffs contend that the proxy statement did not discuss the fairness of the transaction in sufficient detail. As I read the majority opinion, it is only that part of the district court's decision dealing with the fairness of the transaction with which they find fault.

Item 8 of Schedule 13e–3, 17 C.F.R. § 240.13e–100, requires:

Item 8. *Fairness of the Transaction.* (a) State whether the issuer or affiliate filing this schedule reasonably believes that the Rule 13e–3 transaction is fair or unfair to unaffiliated security holders.

. . . .

(b) Discuss in reasonable detail the material factors upon which the belief stated in Item 8(a) is based and, to the extent practicable, the weight assigned to each such factor. Such discussion should include an analysis of the extent, if any, to which such belief is based on the factors set forth in instruction (1) to paragraph (b) of this Item, paragraphs (c), (d), and (e) of this Item, and Item 9.

*Instructions.* (1) The factors, which are important in determining the fairness of a transaction to unaffiliated security holders and the weight, if any, which should be given to them in a particular context will vary. Normally such factors will include, among others, those referred to in paragraphs (c), (d), and (e) of this Item and whether the consideration offered to unaffiliated security holders constitutes fair value in relation to:

(i) Current market prices,

(ii) Historical market prices,

(iii) Net book value,

(iv) Going concern value,

(v) Liquidation value,

(vi) The purchase price paid in previous purchases disclosed in Item 1(f) of Schedule 13e–3,

(vii) Any report, opinion, or appraisal described in Item 9 and

. . . .

(c) State whether the transaction is structured so that approval of at least a majority of unaffiliated security holders is required.

(d) State whether a majority of directors who are not employees of the issuer has retained an unaffiliated representative to act solely on behalf of unaffiliated security holders for the purposes of negotiating the terms of a Rule 13e–3 transaction and/or preparing a report concerning the fairness of such transaction.

(e) State whether the Rule 13e–3 transaction was approved by a majority of the directors of the issuer who are not employees of the issuer.

Plaintiffs contend that in setting forth the factors upon which the fairness determination was made, the proxy statement did not adequately discuss the "going concern value," the "net asset value," or the "liquidation value" of Nationwide. Plaintiffs' argument is not persuasive for a number of reasons. First, plaintiffs are incorrect in asserting that Nationwide was *required* to discuss these factors in the proxy statement. Item 8 does not require the discussion of any factor, it only sets forth the factors which "normally" will be included.

Moreover, the detail of the discussion of any single factor will necessarily depend upon the weight, if any, which was placed upon the factor in reaching a fairness decision. Second, each of the factors which plaintiffs contend were not adequately discussed were at least mentioned in the fairness discussion. The statement explains that First Boston, which independently considered the fairness of the price, considered these factors in reaching its conclusion. Third, and most importantly, the fairness discussion sets forth clearly and in reasonable detail the factors upon which defendants relied in reaching their fairness conclusion.

The proxy statement explained:

Although the Evaluation Committee did not give specific weight to each of the various factors considered in evaluating the fairness of the proposed merger, particular emphasis was placed upon the receipt of the opinion of First Boston.

The members of the Evaluation Committee believed it to be particularly important that the price to be paid to the public shareholders for their Class A Common shares ($42.50 per share) represented a premium over the quoted bid price of the Class A Common shares on the next to last trading day prior to the public announcement of the proposed merger on November 3, 1982, as reported by the National Quotation Bureau, Inc.

In evaluating the overall fairness of the proposed merger, the Evaluation Committee also considered it significant that First Boston would notify the Corporation on the date hereof and on the date immediately preceding the effective date of the merger if events render the financial terms of the proposed merger unfair to the public shareholders; that the Corporation's Class A Directors (five out of six of whom constitute the Evaluation Committee) would have the authority under the Agreement to terminate the Agreement if a majority of public shareholders fail to approve the proposed merger; that the terms of the Agreement were negotiated by independent legal counsel retained by the Evaluation Committee; that the Agreement may be terminated in the event the Corporation receives, prior to the special meeting of the shareholders, a bona fide offer to acquire the publicly held Class A Common shares which offer, in the judgment of the Class A Directors, is more favorable to the public shareholders than the proposed merger; and that the Evaluation Committee had been given full authority to evaluate, make recommendations regarding and respond to offers made or proposed to be made to the Corporation by Nationwide Mutual or any of its affiliates. The Evaluation Committee consisted solely of Class A Directors of the Corporation who are neither directors, officers nor employees of Nationwide Mutual or Nationwide Mutual Fire, nor officers or employees of the Corporation.

Considered in its entirety, I would conclude that the fairness discussion contained in the proxy statement satisfies the disclosure requirements set forth in Item 8. In this regard, it is important to emphasize that the issue before us is not whether the price arrived at was fair, but rather, whether the proxy statement adequately discussed the factors upon which Nationwide could reasonably conclude that the price was fair to the unaffiliated shareholders. The methodology employed in this merger to arrive at a price, including an independent appraisal as well as a review by the Evaluation Committee, supplied a reasonable basis for believing that the ultimate price arrived at was fair.

Plaintiffs also argue that the fairness discussion should have disclosed data about other companies involved in "comparative transaction." Neither Rule 13e–3, nor Schedule 13E–3 contain any requirement that a going-private proxy statement provide any comparative data on mergers involving other companies. Moreover, plaintiffs cite no cases to support this argument. Since there is no evidence indicating that Nationwide relied upon such data in reaching its conclusion regarding the fairness of this transaction, disclosure was not required. In addition, because such information has the potential to mislead, other

courts have held that such information is not material and need not be included in a proxy statement. *Mindell v. Greenberg*, 612 F.Supp. 1543, 1551 (S.D.N.Y.1985) ("The fact that other transactions might have been negotiated on terms plaintiff may have found more favorable is irrelevant"); *Gans v. Filmways, Inc.*, 453 F.Supp. 1116, 1120 (E.D.Pa.1978), *aff'd*, 595 F.2d 1212 (3rd Cir.1979) ("insurance companies are not fungible entities and the value of one company is not a reliable indication of the value of another").

Plaintiffs also contend that the fairness discussion should have disclosed the "fact" that Nationwide's public stock was "thinly traded." This fact according to plaintiffs would tend to offset the importance of the fact that the price offered by Mutual represented a premium of 51.8% over the stock's market price. This argument conflicts with the well-established rule that the proxy statement must set forth a full and fair picture, without interpretation or characterization. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 474–477, 97 S.Ct. 1292, 1301–1303, 51 L.Ed.2d 480 (1977). As disclosed in the proxy statement, Nationwide's Class A Common stock was traded in the over-the-counter market, and 85.6% of the shares were owned by Mutual. Whether under these circumstances the stock should be characterized as "thinly traded," is difficult to say—which is the reason why this type of conclusion need not be included in a proxy statement. The facts speak for themselves.

I would affirm the district court.

### APPENDIX A

The proxy statement provides in pertinent part:

> The members of the Evaluation Committee believe that, from a financial point of view, the terms of the proposed merger are fair to the public shareholders of the Corporation. The committee members considered important, as an indication of the fairness of the proposed merger, the receipt of the written opinion of First Boston. The committee members also considered important a number of other factors discussed with the representatives of First Boston. These factors are the current market price of the Class A Common shares as compared with stock prices of other comparable entities; past and current earnings of the Corporation; past and current price/earnings ratios of the Corporation and other companies having similar operations; past and current price/equity ratios of the Corporation (as computed in accordance with generally accepted accounting principles); and the premium over market price offered to the public shareholders in other similar transactions as well as in other recent acquisitions in the life insurance industry generally. In its discussions with the representatives of First Boston, upon whose opinion the Evaluation Committee has concluded that it is appropriate to rely, these representatives stated that in addition to the above noted factors they had also considered the current overall level of the stock market; historical market prices of the Class A Common shares as compared with market prices for the stock of other comparable entities; going concern value of the Corporation; net book value of the Corporation; liquidation value of the Corporation; various financial ratios; present revenues, expenses, earnings and dividends of the Corporation and trends with respect thereto; the purchase price paid to holders of Class A Common shares by Nationwide Mutual in connection with the December 1978 tender offer for the Class A Common shares; present value of projected future cash flows of the Corporation; replacement value of the Corporation; off balance sheet items of the Corporation; significant trends in the insurance business; competitive environment of the insurance industry; regulatory environment of the insurance industry; and the impact of inflation on the Corporation.

Joint Appendix pp. 545–46.

### APPENDIX B

The First Boston opinion letter reads in its entirety as follows:

November 1, 1982

Board of Directors
Nationwide Corporation
One Nationwide Plaza
Columbus, Ohio 43216

Gentlemen:

You have asked us to advise you as to the fairness to the shareholders of Nationwide Corporation, other than Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company, of the financial terms of a proposed merger whereby the owners of 685,545 publicly held Class A common shares would receive cash for their shares and Nationwide Mutual Insurance Company and Nationwide Mutual Fire Insurance Company would become the only shareholder of Nationwide Corporation. The terms of the merger transaction are that Nationwide Corporation shareholders will be entitled to receive $42.50 for each share of Nationwide Corporation Class A common shares.

In connection with our review, Nationwide Corporation furnished to us certain business and financial data concerning Nationwide Corporation. This information was furnished specifically for the purpose of our advising you as to the fairness of the financial terms of the proposed merger, and our Corporation's representation that the information is complete and accurate in all material respects. We have not independently verified the information. We have also reviewed certain publicly available information that we considered relevant and have had discussions with certain members of Nationwide Corporation's management.

In arriving at our opinion we have also considered, among other matters we deemed relevant, the historical financial record, operating statistics, current financial position and general prospects of Nationwide Corporation and the stock market performance of the Class A common shares of Nationwide Corporation. In addition, we have considered the terms and conditions of the proposed transaction as compared with the terms and conditions of comparable transactions.

Based on our analysis of the foregoing and of such other factors as we have considered necessary for the purpose of this opinion and in reliance upon the accuracy and completeness of the information furnished to us by Nationwide Corporation, it is our opinion that the financial terms of the proposed transaction are fair to the minority shareholders of Nationwide Corporation.

Very truly yours,
THE FIRST BOSTON
CORPORATION